The **GUYOTT COMPANY,** Plaintiff,

v.

**TEXACO, INC.,** Defendant.

Civ. No. 8629.

United States District Court
D. Connecticut.
June 24, 1966.

John D. Fassett, of Wiggin & Dana, New Haven, Conn., for plaintiff.

Morris Tyler, of Gumbart, Corbin, Tyler & Cooper, New Haven, Conn., and James O. Sullivan, Stamford, Conn., for defendant.

TIMBERS, Chief Judge.

Defendant Texaco, Inc. (Texaco) has moved, pursuant to Rule 56(b), Fed.R. Civ.P., for partial summary judgment in its favor dismissing the second count of the complaint in which plaintiff The Guyott Company (Guyott) claims damages resulting from alleged price discrimination by Texaco in the sale of paving asphalt in Connecticut during the period April 9, 1959 to July 29, 1960.

Texaco's summary judgment motion is based on the pleadings, depositions and documentary exhibits. Viewing the inferences to be drawn from the underlying facts contained in these materials in the light most favorable to plaintiff as the party opposing the instant motion, United States v. Diebold, Inc., 369 U.S. 654, 655 (1962), the Court holds that there are genuine issues as to material facts which are not susceptible of summary adjudication but must await

determination at trial, and that defendant is not entitled to judgment as a matter of law. Gordon v. Vincent Youmans, Inc., 358 F.2d 261 (2 Cir. 1965).

Texaco's motion for partial summary judgment accordingly is denied.

## JURISDICTION

Jurisdiction is based on Sections 2(a) and 4 of the Clayton Act, 15 U.S.C. §§ 13 (a) and 15.

## FACTS

In 1956 Texaco, a refiner and supplier of petroleum products, acquired a terminal facility in New Haven for the storage and distribution of paving asphalt, a liquid petroleum product used in the manufacture of paving mix. This facility, located at the New Haven harbor on land owned by Wyatt, Inc., was built and operated by Wyatt. Texaco leased the terminal facility from Wyatt. Prior to 1956 Texaco's only terminals for distribution of paving asphalt in the New England area were located at Bayonne, New Jersey and Providence, Rhode Island. Texaco also had a refinery at Providence.

Having no terminal in Connecticut prior to 1956, Texaco sold minor quantities of paving asphalt in the state. By acquiring a New Haven supply point, Texaco hoped to obtain a larger share of the Connecticut market which was becoming increasingly active due to the state's expanding road building program. Other suppliers competing with Texaco for the same market during the relevant period were Socony Mobil, Shell and American Bitumels.

Guyott has been a distributor of paving asphalt in Connecticut for more than twenty years. Known in the asphalt trade as a "carrier", Guyott maintains a fleet of insulated trucks in which paving asphalt, delivered to a terminal in the refiner's tank ships, can be transported from the terminal. The asphalt, maintained by the refiner in heated tanks at the terminal, is pumped into Guyott's insulated trucks and delivered at substantially the same temperature to heated tanks maintained by asphalt users. The users, termed "mixers" in the trade, blend the paving asphalt with other ingredients—primarily stone, gravel and trap rock—into road mix, which they either apply directly to road beds or sell to construction contractors who apply it. Guyott purchases paving asphalt from suppliers for resale to mixers for its own account; it also transports asphalt as a common carrier for suppliers selling directly to mixers. Most of Guyott's income is derived from its trucking operations.

Prior to Texaco's acquisition of a New Haven terminal, Socony Mobil was Guyott's primary supplier. Other distributors competing with Guyott for the sale of paving asphalt were Vinci, Ford Brothers, Cronin and Elm Oil. These distributors conducted their hauling operations under license from the Connecticut Public Utilities Commission (P.U.C.); the rates charged for hauling paving asphalt from the supplier's terminal to the mixing plants were determined by the P.U.C. In addition to these competing distributors, certain suppliers, such as Shell, Socony Mobil, American Bitumels, Esso, Cities Service, and ultimately Texaco, sold directly to mixers, thereby competing with Guyott and other distributors.

New Haven Trap Rock (Trap Rock) is the largest mixer in Connecticut. It operates plants in North Branford, North Haven, Plainville, Wallingford and Newtown. From 1949 to 1956 Guyott supplied an undetermined percentage of Trap Rock's paving asphalt requirements at these plants with the Socony Mobil product. Guyott hauled asphalt which Socony Mobil sold directly to Trap Rock; it also resold to Trap Rock asphalt which Guyott purchased from the Socony Mobil terminal. Trap Rock's competitors in the manufacture and sale of road mix in Connecticut were Tomasso in North Haven, Leverty & Hurley in Waterbury, Suzio in Meriden and Norwalk Asphalt & Paving Corporation in Norwalk. At various times from 1956 through 1960 Guyott resold and hauled asphalt to these mixers.

On March 5, 1956 Texaco and Guyott entered into a written contract pursuant to which Texaco agreed for a 10 year period to sell paving asphalt to Guyott at Texaco's New Haven terminal. The price was stated to be "Seller's established price at New Haven, Connecticut, less $1.25 per ton, provided such established price is competitive with the prices of other sellers of like asphalt in the market area to be served" (Plaintiff's Exhibit 22 for identification). Texaco did not agree to market its asphalt exclusively through Guyott, nor was Texaco to be Guyott's sole supplier. Texaco was not bound to supply Guyott at the stated price more than 8000 tons per month. The contract provided for an annual minimum of 25,000 tons and an annual maximum of 35,000 tons.

Texaco's New Haven terminal was not in operation until late in the summer of 1956. Guyott purchased 22,000 tons from Texaco annually in 1957 and 1958 and approximately 25,000 tons in 1959. In 1957 and 1958 Guyott resold approximately 7,000 tons to Trap Rock's Newtown, Plainville and Wallingford plants —the entire asphalt requirements of those plants. Socony Mobil retained the account for Trap Rock's North Branford and North Haven plants where most of Trap Rock's total paving asphalt requirements was consumed.

In 1956, 1957 and 1958 Texaco made few direct sales of paving asphalt to Connecticut mixers. Beginning in 1959, however, and throughout the period during which the price discrimination here alleged took place (April 9, 1959 to July 29, 1960), Texaco sold directly to Trap Rock's Newtown, Plainville and Wallingford plants 7,300 tons of paving asphalt, supplanting Guyott as the supplier of those plants. The 7,300 tons Texaco sold directly to Trap Rock, however, was transported to the Trap Rock plants in Guyott trucks. For its trucking services Guyott charged Texaco hauling rates prescribed by the P.U.C., which averaged $2.75 per ton. During this period Socony Mobil continued to retain the larger accounts at Trap Rock's North Branford and North Haven plants.

Texaco charged Trap Rock a delivered price of $19.25 per ton. This figure included the charges for hauling the paving asphalt in Guyott trucks from Texaco's New Haven terminal to Trap Rock's three plants. Texaco apparently paid the delivery charges directly to Guyott. During the same period Texaco charged Guyott prices for paving asphalt which varied from $17.50 to $18.00 per ton F.O.B. the New Haven terminal.

## PROCEEDINGS IN THIS COURT

On December 30, 1960 Guyott commenced an action against Texaco for breach of the March 5, 1956 written contract for the sale of paving asphalt. Deducting the delivery charges paid by Texaco on sales to Trap Rock, Guyott alleged that Texaco actually was receiving a lower price from Trap Rock and, therefore, had breached that part of the contract which bound Texaco to sell to Guyott at Texaco's "established price" at New Haven, less $1.25 per ton. Plaintiff, having been granted leave to amend its complaint May 21, 1962, added a second count alleging in substance that the lower net price Texaco charged Trap Rock also constituted indirect price discrimination proscribed by Section 2(a) of the Clayton Act.

## CLAIMS OF THE PARTIES

As a result of Texaco's alleged price discrimination in favor of Trap Rock, Guyott claims that its business was injured in the following ways:

(i) Guyott's ability to compete with its · competitors (presumably other distributors of paving asphalt) was impaired, resulting in lost sales and profits;

(ii) Guyott's ability to compete with defendant for sales of paving asphalt to Trap Rock was impaired, resulting in lost profits; and

(iii) Guyott's customers other than Trap Rock, due to their inability to compete with Trap Rock in the sale of paving mix to con-

struction contractors, reduced their purchases from Guyott, resulting in lost sales and profits.

In its motion for partial summary judgment addressed to the second count of the complaint, Texaco asserts that:

(i) The price Guyott paid Texaco for paving asphalt was in fact *lower* than the delivered price paid by Trap Rock—the only relevant price for purposes of computing price differential under the Robinson-Patman Act— and hence there was no detrimental price difference essential to establishing a price discrimination claim;

(ii) Guyott, a distributor, not being a competitor of Trap Rock, a so-called "mixer", cannot maintain a *secondary* line price discrimination action in which it is necessary to show, in order to prove the adverse effect on competition required by Section 2(a), that the alleged disfavored purchaser was in competition with the alleged favored purchaser; and

(iii) Guyott cannot maintain a *primary* line price discrimination action against Texaco because Guyott, a distributor, was not a competitor of Texaco, a supplier; but, even assuming it could be considered in competition, absent a showing that (a) Texaco *predatorily* reduced its price to Trap Rock, (b) competition was injured thereby, and (c) Guyott was proximately injured as a result thereof, plaintiff cannot establish a price discrimination claim on any theory.

## ELEMENTS OF SECTION 2(a) PRICE DISCRIMINATION CAUSE OF ACTION

██ The phrase "to discriminate in price", as used in Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a), means merely to effect a *difference* in price. The phrase itself carries "no overtones of business buccaneering." F.T.C. v. Anheuser-Busch, Inc., 363 U.S. 536, 549 (1960). Congress has expressly provided certain standards for determining, once a price difference has been proven, the illegality of such difference. The price difference must have the proscribed adverse effect on competition by either substantially lessening competition, tending to create a monopoly in any line of commerce, or injuring competition with any person who grants or knowingly receives the benefit of the price difference or with customers of either of them. This Court may not read into the statutory phrase additional conditions of illegality, for that would impair the express statutory scheme. Id. at 550–551.

These are the basic elements of a cause of action for price discrimination under Section 2(a): (i) a difference in price between different purchasers of commodities of like grade and quality, (ii) occurring in interstate commerce, (iii) which causes the proscribed injury to competition, and (iv) the absence of the statutory defenses set forth in the "cost justification" proviso of Section 2(a) or in the "meeting competition" proviso of Section 2(b). Shore Gas and Oil Company v. Humble Oil & Refining Company, 224 F.Supp. 922, 924 (D.N.J. 1963).

## EXISTENCE OF A DETRIMENTAL PRICE DIFFERENTIAL

Texaco maintains that its relevant price to Trap Rock, for the purpose of computing price differential under Section 2(a), is the delivered invoice price paid by Trap Rock, inclusive of the hauling charges defrayed by Texaco. See Rowe, Price Discrimination Under The Robinson-Patman Act 87–88 (1962); Austin, Price Discrimination And Related Problems Under The Robinson-Patman Act 22–24 (2d rev. ed. 1959). From April 9, 1959 to July 29, 1960, the period of alleged price discrimination, Trap Rock paid Texaco an average delivered price of $19.25 per ton of paving asphalt,

while the price Texaco charged Guyott for the same product F.O.B. the New Haven terminal varied from $17.50 to $18.00 per ton. Any price differential existing at that time, defendant argues, was in Guyott's favor.

Guyott asserts that the relevant price to Trap Rock, for the purpose of computing a Section 2(a) price differential, is the price Texaco received from Trap Rock after deducting hauling charges defrayed by Texaco. According to Guyott's computation, the price to Trap Rock during the relevant period ranged from $16.35 to $16.89 per ton. Payment by Texaco of hauling charges on sales made to Trap Rock constituted, according to Guyott, a discriminatory freight arrangement violative of the indirect price discrimination provision of Section 2(a).

The cases relied upon by plaintiff to support its theory of computing price differential, although uniformly standing for the general proposition that discriminatory freight and delivery arrangements constitute indirect price discrimination under Section 2(a), do not conclusively establish that the particular pricing practice here involved is such a discriminatory arrangement. Corn Products Refining Co. v. F.T.C., 324 U.S. 726 (1945), and F.T.C. v. A. E. Staley Mfg. Co., 324 U.S. 746 (1945), involved single basing point price systems; and F.T.C. v. Cement Institute, 333 U.S. 683 (1948), involved a multiple basing point system which produced sham or so-called "phantom freight" charges amounting to indirect price discriminations. The freight charges here defrayed by Texaco were not sham. The Can Company cases—American Can Co. v. Bruce's Juices, 187 F.2d 919 (5 Cir. 1951), modified 190 F.2d 73 (5 Cir. 1951), petition for certiorari dismissed, 342 U.S. 875 (1951), and American Can Co. v. Russellville Canning Co., 191 F.2d 38 (8 Cir. 1951)—are closer, but not squarely in point; they involved a supplier's discriminatory grant of freight allowances to competing purchasers by equalizing freight to the factories of

some purchasers, but not to the factories of the respective complainants.

To establish the validity of its method of computing price differential, Texaco relies heavily on statements from the widely respected Rowe and Austin treatises, supra. Both commentators espouse the general principle that the relevant price for measuring price differential under Section 2(a) is "the *actual invoice price quotation* by a seller, (1) *inclusive* of any elements of prepaid freight, (2) *less* any discounts or offsets against the invoice price." Rowe, op. cit. supra at 87 (emphasis that of author); see Austin, op. cit. supra at 24.

■ As a general rule the pertinent statutory "price" is the total delivered price paid by the buyer regardless of the place or method of delivery. The legislative history of the Robinson-Patman Act clearly demonstrates Congressional intent to discard the "mill-net" theory of price. The House Judiciary Committee included in its amended version of the Patman bill a provision that price "shall be construed to mean the amount received by the vendor after deducting actual freight or cost of other transportation, if any, allowed or defrayed by the vendor" (H.R.Rep. No. 2287, 74th Cong., 2d Sess. 2 (1936)) in an attempt to "put an end to price discrimination through the medium of the basing-point or delivered-price system of selling commodities" and to "require the use of the f. o. b. method of sale" (H.R.Rep. No. 2287, 74th Cong., 2d Sess. 14 (1936)). But this provision was rejected (80 Cong. Rec. 7760–7761, 8126–8127, 8140 (1936)).

Neither the relevant legislative history nor the general observations of Rowe and Austin, however, should be construed as establishing a hard and fast rule that under no circumstances may delivery charges defrayed by a seller be considered in determining price differential under Section 2(a). Congressional rejection of the above mentioned provision, according to Rowe, merely reflected "a Congressional refusal to impugn delivered or 'laid down' prices to the buyer as per se discriminatory, or to compel f. o. b.

pricing by sellers." Rowe, op. cit. supra at 88. Both commentators, moreover, recognize that the discriminatory use of freight or delivery terms of sale having the proscribed adverse effect on competition constitutes unlawful indirect price discrimination under Section 2(a). Rowe, op. cit. supra at 104–106; Austin, op. cit. supra at 25. See, e. g., Corn Products Refining Co. v. F.T.C., supra; American Can Co. v. Bruce's Juices, supra; 1 CCH Trade Regulation Reporter ¶ 3375; F.T.C. Trade Practice Rules for the Wire Rope Industry 6 (1963) (Exhibit B to Memorandum of Plaintiff Re Defendant's Motion Dated April 1, 1963 And Defendant's Objections To Interrogatories). The Robinson bill passed by the Senate proscribed direct or indirect discrimination "in price or terms of sale"; the House-Senate Conference, however, deleted the last four words, noting that "the bill should be inapplicable to terms of sale except as they amount in effect to indirect discriminations in price within the meaning of the remainder of subsection (a)" (H.R.Rep. No. 2951, 74th Cong., 2d Sess. 5 (1936)).

■ To accept as a universal rule the theory of computation urged by defendant would emasculate the indirect price discrimination provision in Section 2(a). A seller would be able easily to circumvent the statutory proscription by defraying actual delivery costs for his preferred customers, while quoting f. o. b. mill, or, as here, f. o. b. terminal, prices to his less favored customers. There is nothing in the statute, legislative history or case law which suggests such a result. The view which commends itself to the Court is that stated by Representative Patman:

> " 'Price' could therefore mean the amount paid for the merchandise f. o. b. the place of business of the seller or f. o. b. the place of business of the buyer, depending on the terms and conditions applying to the transaction. In order properly to compare two or more transactions of a seller with two or more of his customers, for the purpose of determining whether discrimination is involved, the prices must be reduced to a common denominator. In other words, an effort should be made to determine whether the difference in the prices reflects an allowance for the cost of the transportation involved. Then we have a common denominator: the net price received by the seller from the two buyers in question." Patman, Complete Guide to the Robinson-Patman Act 14 (1963).

The prices Texaco charged Guyott and Trap Rock for paving asphalt and the charges Texaco paid Guyott for hauling asphalt to Trap Rock's mixing plants during the relevant period having been proven in the course of discovery proceedings, the Court finds the requisite detrimental price differential within the meaning of Section 2(a) to have been established.

Having found that Guyott has established the first element of an indirect price discrimination action, the Court must consider the remaining issues raised by Texaco's motion for partial summary judgment: whether Guyott, as a matter of law, has failed to establish the required adverse effect on competition, and, if that be the case, whether there is a genuine issue of fact regarding alleged injury to Guyott's business resulting from the price differential.

## ADVERSE EFFECT ON COMPETITION

■ Section 2(a) of the Clayton Act prohibits injury to competition at any one of three distributive levels (Austin, op. cit. supra at 45):

(1) competition with the seller granting a price discrimination ("primary line" injury);

(2) competition with the seller's purchaser receiving the lower price ("secondary line" injury); and

(3) competition with a customer of the purchaser receiving the lower price ("third" or "tertiary line" injury).

■ Any doubt that Section 2(a) did not apply to primary line injury was emphatically dispelled by the Supreme

Court in F.T.C. v. Anheuser-Busch, Inc., supra at 542–543. Essential to primary line injury is "the existence of some *competitive* relationship" between "sellers of the *same* product." Rowe, op. cit. supra at 142–144. (emphasis that of author) Although, as defendant stresses, Guyott is a distributor and Texaco a supplier, there has been sufficient evidence adduced from which it could be found, drawing all inferences of fact in favor of plaintiff (United States v. Diebold, Inc., supra at 655, 6 Moore's Federal Practice ¶ 56.15[3] (2d ed. 1965)), that Guyott, albeit as a reseller, competed with Texaco for sales of paving asphalt to Trap Rock. The Court cannot find as a matter of law that plaintiff, so far as competitive relationship is concerned, has failed to establish a primary line case.

Defendant contends that plaintiff cannot maintain a secondary line action without showing that Guyott, as the alleged disfavored purchaser, was in substantial competition with Trap Rock, the alleged favored purchaser. Balian Ice Cream Co. v. Arden Farms Co., 231 F.2d 356, 368 (9 Cir. 1955), cert. denied, 350 U.S. 991 (1956); Chicago Sugar Co. v. American Sugar Refining Co., 176 F.2d 1, 10 (7 Cir. 1949), cert. denied, 338 U.S. 948 (1950). Inasmuch as Guyott is a distributor of paving asphalt and Trap Rock is a mixer, defendant argues, the competitive relationship requisite to secondary line injury is lacking.

■ Since a supplier has a natural monopoly in its product, which gives competitive leverage not traceable to price discrimination, a supplier is under no obligation to sell to its distributors at a price sufficiently low to enable the distributors to compete with the supplier for the business of retailers to whom the supplier sells directly. See A. J. Goodman & Son v. United Lacquer Mfg. Corp., 81 F.Supp. 890, 893 (D.Mass. 1949). A supplier's sale to its retailer at a price lower than that charged wholesalers whose customers compete with the favored retailer may violate Section 2 (a). F.T.C. v. Morton Salt Co., 334 U.S.

37 (1948); J. T. Jones v. Metzger Dairies, Inc., 334 F.2d 919 (5 Cir. 1964), cert. denied, 379 U.S. 965 (1965) (dictum); Krug v. International Telephone & Telegraph Corp., 142 F.Supp. 230 (D. N.J.1956); Rowe, op. cit. supra at 175, 527; Austin, op. cit. supra at 48. The discrimination there involved results in injury to competition with the favored retailer, a direct purchaser of the supplier; it does not result in injury to competition with a customer of the supplier's customer. This type of injury, therefore, gives rise to a *secondary* line case and not, as both parties here indicate, a third or tertiary line case. Rowe, op. cit. supra at 196 n. 97. "The so-called 'third-line' injury concept comes into play only when the supplier *favors* his distributors, whose customers compete with other purchasers from the supplier, whereby competition *with* the *customer* of the purchaser may be impaired." Ibid. (emphasis that of author)

In *Morton Salt,* a case involving sales of salt by a manufacturer to chain retail stores at prices which enabled them to retail salt for less than the manufacturer's wholesaler could sell to smaller retailers in competition with the chain outlets, the Supreme Court held, supra at 55, that the paragraph of a F.T.C. cease and desist order which prohibited sales by the salt manufacturer who was selling "to any retailer at prices lower than prices charged wholesalers whose customers compete with such retailer", was authorized by Section 2(a).

In holding that a wholesaler could maintain a treble damage action when price discrimination by his supplier rendered his customers unable to compete with favored purchasers on the retail level, the court in *Krug* rejected the argument here advanced by defendant that Section 2(a) is violated only when the discrimination involves sales made to competitors or purchasers on the same level of distribution. The court in *Krug* found, supra at 235, that the Robinson-Patman Act was designed to protect wholesalers from discriminatory conces-

sions given by manufacturers to retailers whose size and volume of sales lead to a by-passing of the wholesaling function.

Texaco seeks to distinguish *Morton Salt* and *Krug* on the ground that the favored retailer in both cases *resold* the product *intact,* whereas Trap Rock, the alleged favored purchaser here, was a user, not a reseller, of paving asphalt. The scope of the term "resale" as used in Section 2(a) is unclear. Whether, for example, "resale" within the terms of Section 2(a) should be accorded the same broad meaning as that accorded "resale, with or without processing" under Section 2(e) (see Corn Products Refining Co. v. F.T.C., 324 U.S. 726, 744 (1945)) is a question which, so far as this Court has been able to ascertain, has never been raised, much less resolved. It is not necessary to decide this question here, because neither *Krug* nor *Morton Salt* compels the narrow application urged by defendant. The court in *Krug,* supra at 236, formulated its rule in the following broad language which should apply with equal force whether or not the favored purchaser resells intact:

> "The wholesaler is one of the immediate purchasers from the manufacturer and it would seem to make no difference that his injury was not suffered by his inability to compete with others on his own distributive level but by the failure of his customers to meet the competition of another immediate purchaser from the manufacturer."

Furthermore, whether or not the product is resold intact is irrelevant for purposes of determining price discrimination under Section 2(a). The critical question, as suggested by *Krug* and *Morton Salt,* is whether the price discrimination enables the favored purchaser to sell the product, intact or—as here—as an essential ingredient of another product, so as to affect adversely competition with such favored purchaser.

Defendant relies heavily on the cases of Secatore's, Inc. v. Esso Standard Oil Co., 171 F.Supp. 665 (D.Mass.1959), and Sano Petroleum Corp. v. American Oil Co., 187 F.Supp. 345 (E.D.N.Y.1960), for its assertion that a supplier such as Texaco may lawfully sell to its consumer accounts at a price below that paid by the supplier's distributors. Both *Secatore's* and *Sano* involved sales of gasoline by refiners to large commercial consumers at prices below those paid by the complaining parties—a retail dealer in *Secatore's* and a distributor in *Sano.* The distributor in *Sano* served, as did plaintiff in the instant case, a dual distributive function: purchasing gasoline from its supplier for resale to dealers and consumers, and acting as cartage agent for the refiner's direct sales to consumer accounts. In both *Secatore's* and *Sano* the courts held that the refiners' pricing practices did not violate Section 2(a) because the price differentials involved did not and could not adversely affect competition. The disfavored retailer and distributor, as a matter of practical economics, could not supplant the refiners as suppliers of the commercial users, even if the refiners sold gasoline to them at the same prices at which they were selling to the users. Since competition between the complainants and their suppliers could not be injured absent a price differential, the courts reasoned, the complainants were not further harmed by the suppliers' selling to the commercial users at lower prices.

The economic logic of these decisions is sound. There is no indirect price discrimination *per se* when a supplier sells to a consumer at a lower price than it quotes to a distributor or retailer. Rowe, op. cit. supra at 178. The holdings in both *Secatore's* and *Sano,* that competition with the refiner was not adversely affected, were based in part on findings that the customers of the disfavored purchaser were not in competition, actual or potential, with either the favored purchaser or his customers, and that the favored purchaser had never been a customer of the disfavored purchaser.

There is evidence in the instant case adduced by both parties during discovery

proceedings tending to show that Trap Rock was in competition with some of Guyott's customers and that Trap Rock itself had been a customer of Guyott during a period immediately preceding the alleged discrimination. Even if the Court were to accept defendant's assertion that a rule formulated in the District of Massachusetts and subsequently followed in the Eastern District of New York "is the law in the Second Circuit" (Memorandum In Support Of Defendant's Motion For Partial Summary Judgment, p. 23), that rule does not help defendant in the instant case.

Plaintiff has not failed as a matter of law to establish the required adverse effect on competition.

## INJURY TO PLAINTIFF'S BUSINESS

█ Defendant's assertion that it is necessary for plaintiff to show that Texaco predatorily reduced its price to Trap Rock is clearly erroneous. Predatory motivation is not a requisite element of an indirect price discrimination action based on primary, secondary or third line injury (F.T.C. v. Anheuser-Busch, Inc., 363 U.S. 536, 552 (1960); Rowe, op. cit. supra 150, 160), although it may be relevant in determining the likelihood of injury to competition.

█ Plaintiff, having established that there are at least triable issues of fact as to the existence of a price differential which adversely affected competition on a recognized distributive level, is required to show, for purposes of this motion, only that triable issues of fact remain as to whether defendant's conduct actually resulted in measurable injury to plaintiff's business. It is clear, at least in this Circuit, moreover, that the measure of recovery in a suit by a private party seeking to enforce the Robinson-Patman Act is *actual* injury. Enterprise Industries, Inc. v. Texas Co., 240 F.2d 457, 458–460 (2 Cir. 1957), cert. denied, 353 U.S. 965 (1957); accord, American Can Co. v. Russellville Canning Co., 191 F.2d 38, 54, 60 (8 Cir. 1951).

█ The evidence adduced by the parties during discovery proceedings does not establish as a matter of law the absence of actual damage caused by defendant's pricing practices.

Defendant, attempting to demonstrate that the record at this stage eliminates issues of material fact as to plaintiff's alleged damages, relies on the following:

(1) That Guyott's books show an increase in its volume of sales during the period 1958–1961;

(2) That Guyott's gross income from sales during the period of alleged discrimination was higher than it was before or after that period;

(3) That one of Guyott's customers, A. Tomasso, underbid Trap Rock for the paving mix requirements of the State of Connecticut during the time Texaco sold asphalt directly to Trap Rock; and

(4) That Guyott's officers, Louis E. Guyott and Francis R. Guyott, at the time their depositions were taken, did not know:

(a) whether those of Guyott's customers geographically able to compete with Trap Rock actually did so,

(b) what Trap Rock charged for its road mix,

(c) what Trap Rock's competitors charged for their road mix,

(d) whether the sales volume of Trap Rock's competitors decreased in 1959 and 1960,

(e) whether the income of Trap Rock's competitors increased or decreased during 1959 and 1960, and

(f) whether Trap Rock's competitors lost any customers during 1959 and 1960.

The fact that Guyott's total volume of sales may have increased during the period of alleged discrimination obviously does not establish that it did not lose sales as a result of Texaco's pricing practices. Plaintiff's increase in sales may well have been attributable to the

burgeoning Connecticut road building program to which both parties refer. Guyott lost the Trap Rock business at its Plainville, Wallingford and Newton plants to Texaco; and there is evidence, drawing inferences in plaintiff's favor, that Guyott lost this business as a direct result of Texaco's price discrimination. Texaco's attempt to negate this evidence by pointing out that Socony Mobil, not Guyott, supplied a major portion of Trap Rock's asphalt requirements prior to 1959 reflects the weakness of defendant's position. The critical question is what sales did Guyott lose as a result of the price it paid to Texaco, not what accounts Guyott retained or obtained during the relevant period. There is evidence that several of Guyott's customers reduced their purchases from Guyott during 1959 and 1960 because Guyott's competitors were able to quote lower prices (Deposition of Louis Guyott, pp. 36–38), and that Texaco was aware that Guyott was losing business (Plaintiff's Exhibit 127 for identification).

That Guyott's gross income from sales was higher during 1959 and 1960 than it was in either 1958 or 1961 is no more conclusive on the issue of relevant injury to Guyott's business than evidence of increased sales volume. There is some question, moreover, whether the figures upon which defendant relies are correct. Defendant claims that plaintiff's gross income for the years 1958 through 1961 was $7,366, $68,985, $48,765 and $31,210, respectively, citing the deposition of Francis R. Guyott, pp. 195–196, and a document entitled "Guyott Company Comparative Condensed Statements of Income and Surplus for The Five Years Ending December 31, 1962" (Defendant's Exhibit 6 for identification). Plaintiff points out, however, that due to a reporting error the figure of $7,366 appears in the deposition transcript as plaintiff's gross income for 1958 rather than the correct figure of $77,366 as reflected in Defendant's Exhibit 6. If plaintiff is correct, the figures would indicate a marked decline in gross income from sales which might well be attributed to defendant's conduct.

The fact that A. Tomasso, a customer of Guyott, underbid Trap Rock for the State of Connecticut's paving mix requirements at Plainville (Deposition of Francis R. Guyott, pp. 193–195, where reference is made to the State of Connecticut Award Schedule 1959–1960) does not itself negate plaintiff's claim that the ability of its other customers, or, for that matter, of A. Tomasso, to compete with Trap Rock was impaired by Texaco's pricing practices. There is some evidence, moreover, that A. Tomasso was able to underbid Trap Rock only by plaintiff's reselling to Tomasso at prices *below* those at which it purchased from Texaco (Deposition of Harry J. White, pp. 103–104; Plaintiff's Exhibit 107 for identification).

From the fact that Guyott officers were unaware at the time of their depositions of certain information enumerated above by defendant, it does not necessarily follow that plaintiff's claim of injury to its business resulting from defendant's price differential is deficient. It merely reinforces the conclusion that summary adjudication of the complex factual issues raised by plaintiff's claim is not appropriate at this stage of the proceedings. The record is not ripe for summary judgment. The difficult questions raised can be properly resolved only by an orderly, detailed and comprehensive presentation of economic data. Such presentation has not been made.

## CONCLUSION

There being genuine issues as to material facts with respect to the second count of the complaint which are not susceptible of summary adjudication but must await determination at trial, and defendant not being entitled to judgment as a matter of law on the second count, its motion for partial summary judgment is denied.

The foregoing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52, Fed.R.Civ.P.