ROBBINS FLOORING, INC.

v.

FEDERAL FLOORS, INC.,

and

James Aurino and Lois Aurino.

Civ. A. No. 75–3450.

United States District Court,
E. D. Pennsylvania.

Sept. 28, 1977.

Richard D. Malmed, Philadelphia, Pa., for plaintiff.

Robert J. Spiegel, Philadelphia, Pa., for defendants.

## OPINION

DITTER, District Judge.

Plaintiff sued on a book account.[1] Defendants counterclaimed seeking treble damages in their individual and representative capacities for alleged violations of the antitrust laws. Presently before the court is plaintiff's motion to dismiss portions of the counterclaim under Fed.R.Civ.P. 12(b)(6), defendants' motions for class action certification, and defendants' motion to stay any execution of judgment. For the reasons hereinafter stated, the motions of both parties must be denied.

### 1. The Factual Background

Accepting as true the allegations of the counterclaim and reasonable inferences deducible therefrom, as I must on plaintiff's motion to dismiss the facts giving rise to defendant's[2] claim may be summarized as follows. For a period of more than 15 years preceding this controversy, Federal had been an authorized distributor of products sold by plaintiff, Robbins Flooring, Inc. (hereafter "Robbins"), a Tennessee corporation engaged in the manufacture of hardwood and other flooring components. Pursuant to a long-standing arrangement between the parties, plaintiff's credit terms on all purchase orders were 90 days net from the invoice date with a credit limit not to exceed $125,000. However, on December 5, 1974, Robbins unilaterally reduced the terms of payment to 60 days with a limit of $75,000. Thirteen days later, plaintiff wrote to Federal, claiming that $14,042.34 was payable under the new 60 day terms. Federal disputed that this sum was actually due. By mid-January, the amount claimed had increased to over $36,000., even though only $2,842. was actually owed under the 90 day terms. The latter sum was paid on January 31, 1975. On April 9, 1975, Robbins insisted that contractors' checks be made payable to both Federal and Robbins before shipments on existing orders would be made to Federal. Thereafter, by mid-May, plaintiff was requiring advance payments. Robbins, which has a dominant market position in the sale of hardwood flooring, also was refusing to sell its hardwood flooring to its distributors unless they purchased all necessary components. These parts[3] were readily obtainable from other sources, and could be secured at a considerably lower price. Finally, the parties' relationship terminated and Federal is no longer a distributor of Robbins' products.

Count II[4] of defendant's counterclaim alleges that the acts of Robbins in reducing

---

1. Plaintiff instituted this action on November 28, 1975, demanding judgment of $66,347.83 with interest for certain flooring materials delivered to defendant Federal Floors, Inc. James and Lois Aurino were named as individual defendants on the basis of personal guarantees executed by them for any debts incurred by Federal. By stipulation of counsel dated November 30, 1976, the parties agreed to the entry of partial summary judgment for $63,096.75. The figure has been amended to $76,767.61 by stipulation dated February 24, 1977.

2. Hereafter, I shall refer to defendants as Federal and in the singular.

3. Said parts consisted of steel clips, steel channels, fiber board, polyethylene moisture barrier and polyethylene foam.

4. Count 1 charges that as a result of Robbins' failure to fulfill certain purchase orders, Federal was required to effect purchases from other suppliers at increased costs. In addition, defendant asserts that Robbins maliciously and erroneously informed banks and contractors that Federal was a poor credit risk and that it had been delinquent in its payments for a long period of time. Defendant also contends that plaintiff's requiring a "joint checking arrangement" with contractors damaged Federal's

Federal's line of credit until there was no credit arrangement at all was discriminatory and constituted violations of Sections 2(a) and (e) of the Robinson-Patman Antidiscrimination Act, 15 U.S.C. § 13. Count III, brought by defendant individually and on behalf of a class it purports to represent, charges that Robbins engaged in an illegal tying arrangement in violation of Section 3 of the Clayton Act and Section 1 of the Sherman Act. I shall consider each count separately.

### 2. Credit Discrimination as a Form of Price Discrimination under the Robinson-Patman Act

Section 2 of the Robinson-Patman Act prohibits comprehensively a seller's discrimination, either direct or indirect, between different purchasers of like commodities where the effect of such discrimination may substantially lessen competition, create a monopoly, or injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefits of such discrimination. In particular, this prohibition extends to price (subsection a), commissions, allowances, discounts or other compensation (subsection c), payment for services and facilities (subsection d), and the furnishing of services in connection with the processing, handling, or sale of commodities (subsection e).

■ Plaintiff contends that credit differentials have been excluded from coverage under the Act, and it is true that the reported cases involving varying credit terms to competing customers have universally held that such a practice does not violate Sections 2(d) or (e). *Skinner v. United States Steel Corp.*, 233 F.2d 762 (5th Cir. 1956); *Clausen & Sons, Inc. v. Theo. Hamm Brewing Co.*, 284 F.Supp. 148 (D.Minn. 1967), rev'd on other grounds 395 F.2d 388 (8th Cir. 1968); *Secatore's, Inc. v. Esso Standard Oil Co.*, 171 F.Supp. 665 (D.Mass. 1959). But, as the court said in *Lang's Bowlarama, Inc. v. AMF Incorporated*, 377 F.Supp. 405, 408 (D.R.I.1974), summary

judgment in each case was entered on the ground that the credit policies at issue were not violative of Sections 2(d) and (e) of the Act. Thus, although these cases conclusively establish that credit terms are not services or facilities within the meaning of the Act and preclude defendant's maintaining its Section 2(e) claims, there remains the question of whether the alleged discriminatory policy of plaintiff would violate Section 2(a), the prohibition against price discrimination.

■ A violation of Section 2(a) cannot occur unless two or more buyers are charged different prices. *FTC v. Anheuser-Busch, Inc.*, 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960). Because price has not been specifically defined in the Robinson-Patman Act, the courts have had to develop their own definition, and, in general, they have held that it is the amount actually paid or laid out for goods by the buyer. This approach has resulted in a formula: price is the actual invoice quotation by a seller less any discounts, offsets, or allowances against the invoice amount. *Guyott Co. v. Texaco, Inc.*, 261 F.Supp. 942, 948 (D.Conn.1964).

■ As the section provides, price discrimination may be direct or indirect. Direct price discrimination occurs when a seller charges different prices to different purchasers, *Anheuser-Busch, Inc.*, supra, but it can also result from the offering of discounts and allowances. *Bargain Car Wash, Inc. v. Standard Oil Co. (Indiana)*, 466 F.2d 1163 (7th Cir. 1972). Indirect price discrimination, on the other hand, arises when one buyer receives something of value not offered to other buyers. *National Dairy Products Corp. v. FTC*, 412 F.2d 605 (7th Cir. 1969) (free goods and cost payments); *Guyott*, supra (discriminatory use of freight or delivery terms of sale); *B & W Gas, Inc. v. General Gas Corp.*, 247 F.Supp. 339 (N.D. Ga.1965) (furnishing extra labor in customer installations could amount to price discrimination).

credit and business reputation, and demands $10,000. in punitive and compensatory dam-

ages for Robbins' acts. This count is not affected by the present motion.

Plaintiff asserts that defendant's allegations amount to nothing more than a mere difference in credit arrangements, which is not per se discriminatory, and, therefore, that defendant has failed to state a claim of price discrimination. Although I have found no case where a party's credit policies were found violative of Section 2(a), the possibility remains that the withdrawal of credit Federal alleges was used in such a manner as to substantially lessen competition or injure, destroy, or prevent competition. In fact, the court in *Craig v. Sun Oil Company of Pennsylvania,* 515 F.2d 221, 224 (10th Cir. 1975), relied on by Robbins, recognized that in an extreme situation there might be a violation of the Act by reason of the magnitude or nature of discrimination in the extension of credit. Credit is in effect an allowance: the buyer is permitted to delay payment, obtain financing that might not otherwise be available, and save the interest charges on the amount due for the period of time involved. Credit may be an important item in the survival of many businesses. Without it, distributors such as Federal are often unable to pay for orders due to the cash flow problems that result from the delay in securing payment from their own customers. Therefore, the extension of credit can be a powerful weapon, and the potential exists for its use as an indirect discriminatory practice.

Of course, there are certain pressures on a seller which might lead him to extend different credit terms to different purchasers, as the court pointed out in *Craig,* supra, 515 F.2d at 224:

It is obvious that differences in the borrower's financial strength, business experience, and many other factors bring about differences in the terms of credit, security required, guarantees, and other devices used by creditors under these circumstances.[5]

In addition, Congress recognized that market conditions could dictate the necessity for price differentials by providing in Section 2(a) that

. . . nothing herein contained shall prevent price changes from time to time where in response to changing conditions affecting the market for or the market ability of the goods concerned;

. . .

But these business stresses and changing conditions are more properly a matter of defense, and should not be considered when disposing of a motion to dismiss. *Glowacki v. Borden, Inc.,* 420 F.Supp. 348, 353–54 (N.D.Ill.1976), in distinguishing *Craig,* supra, and *Lang's Bowlarama,* supra, both of which found no illegal discrimination in the granting of differing credit terms, concluded that whether differential credit lines would affect the prices paid by buyers so as to constitute a form of price discrimination is a factual question to be resolved at trial, absent an affirmative showing that the different terms resulted from legitimate business factors. Of course, Robbins on a motion to dismiss cannot make such a factual showing here.

In the absence of authority stating that credit differences can never be a form of price discrimination, I decline to hold that defendant's allegations fail to state a claim under Section 2(a). The general rule is that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1967). Here, Federal contends that the credit terms imposed upon it were different from those imposed upon other purchasers of commodi-

---

**5.** See also *Lang's Bowlarama,* supra, 377 F.Supp. 408–09, where the defendant relied on "significant stresses" affecting the retail bowling area to justify differing credit terms, and *Secatore's, Inc.,* supra, wherein the court held:

. . . The extension of credit involves problems not found in the furnishing of ordinary promotional aids. It may involve diffi-cult questions of business judgment as to the future willingness or ability of the customer to pay. It may entail a possibility of substantial financial loss to the creditor. It may require difficult decisions as to whether to risk financial loss by extending credit or losing a customer's business by denying it. 171 F.Supp. at 668.

ties of like grade and quality, a practice which violated the Act. While this blanket assertion fails to identify the commodities involved or state that the effect of plaintiff's acts was to lessen competition or injure defendant, it does sufficiently apprise plaintiff of its alleged improper conduct. It is difficult to see how expanded pleadings would substantially add to the notice provided by the counterclaim.

Accordingly, plaintiff's motion to dismiss the Section 2(e) action for failure to state a claim is granted, but defendant may pursue its cause of action under Section 2(a).[6]

3. Defendant's Standing to Maintain Sherman and Clayton Act Violations by Virtue of the Tying Arrangement

Count III of defendant's counterclaim charges that plaintiff required the purchase of certain flooring components by those who wished to purchase the flooring itself. Defendant contends that this practice amounted to an illegal tying arrangement in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14, and Section 1 of the Sherman Act, 15 U.S.C. § 1.

Plaintiff asserts, however, that Count III should be dismissed because Federal has no standing to bring it. In support of this position, Robbins asserts that a customer of a seller who indulges in a tying arrangement of the sort pleaded cannot raise the issue of an illegal tie-in, because he is only a customer and not a competitor.[7] Robbins also argues that Federal has failed to demonstrate the existence of a conspiracy or combination by two independent business entities, thus making Section 1 of the Sherman Act inapplicable. However, in making these arguments, plaintiff has ignored the great weight of authority holding to the contrary, and for this reason, I deny its motion to dismiss Count III of the counterclaim.

■ Briefly, a tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). The practice is made illegal by Section 3 of the Clayton Act if the product is a commodity, *Tire Sales Corp. v. Cities Service Oil Corp.,* 410 F.Supp. 1222 (N.D.Ill.1976); otherwise, it is a violation of Section 1 of the Sherman Act. *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); *Higbie v. Kopy-Kat, Inc.,* 391 F.Supp. 808 (E.D.Pa.1975).

■ Tying arrangements are looked upon with such disfavor that, if certain elements are shown, they are "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Railway,* supra, 356 U.S. at 5, 78 S.Ct. at 518; *Tire Sales Corp.,* supra, 410 F.Supp. at 1227. First, there must be in fact a tying arrangement. Second, the seller must possess sufficient economic power with respect to the tying product to restrain free competition appreciably for the tied product. Third, a substantial amount of commerce in

6. Since plaintiff has not moved to dismiss that portion of defendant's counterclaim contained in Count II, paragraph 19 of the Amended Answer, which charges that plaintiff also violated Section 2(a) by extending different guarantees to different purchasers on the same commodities, I need not address that issue.

7. Defendant argues that a discussion of this issue is unnecessary in light of *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), and *Ungar v. Dunkin' Donuts of America, Inc.,* 531 F.2d 1211 (3d Cir.), cert. denied 429 U.S.

823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976) wherein franchisees brought suit against their franchisors, advancing claims of illegal tying arrangement. However, the question of standing was not addressed in those cases, and, therefore, they are not authority for the proposition that defendant has standing here. See *City of Kenosha v. Bruno,* 412 U.S. 507, 512–13, 93 S.Ct. 2222, 2226, 37 L.Ed. 109 (1973); *Monroe v. Pape,* 365 U.S. 167, 191 n. 50, 81 S.Ct. 473, 486, 5 L.Ed.2d 492 (1961). But see *Kelly v. General Motors Corp.,* 425 F.Supp. 13, 17 (E.D. Pa.1976).

the tied product must be restrained. In less demanding Clayton Act cases, plaintiff must only demonstrate the existence of a tying arrangement and either of the second or third elements to make out a violation. To establish a violation under the more stringent non-commodity Sherman Act, all three elements must be present. *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 609–10, 73 S.Ct. 872, 881, 97 L.Ed. 1277 (1953).

Section 4 of the Clayton Act[8] authorizes suit by a private party for injuries sustained as a consequence of an antitrust violation if two criteria are satisfied. First, the party must show that it has suffered injury to "business or property," which has been defined by the Supreme Court as referring to "commercial interests or enterprises." *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 264, 92 S.Ct. 885, 892, 31 L.Ed.2d 184 (1972). Second, the party must demonstrate that its injuries were incurred "by reason of" the other party's illegal activities. As was held in *Hawaii,* supra, 405 U.S. 263 n. 14, 92 S.Ct. 885, this does not mean that every party who can establish some remote connection to the violation has standing. The Third Circuit has confined treble damage relief "to those individuals whose protection is the fundamental purpose of the antitrust laws." *Cromar Co. v. Nuclear Materials & Equip. Corp.,* 543 F.2d 501, 505 (3d Cir. 1976), quoting *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d 122, 125 (9th Cir.), cert. denied sub nom. *Morgan v. Automobile Mfgrs. Assn.,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973). The court did not attempt to construct an all-encompassing test; it suggested instead that each case be analyzed on its particular facts. *Cromar,* supra, 543 F.2d at 506.

Here, Federal has sufficiently alleged the monopolistic position, market dominance, economic power and restraint on free competition to which the cases[9] refer. Although there is no definite statement which asserts the effect upon commerce resulting from Robbins' activities, under a liberal reading of the counterclaim, *Radovich v. National Football League,* 352 U.S. 445, 453, 77 S.Ct. 390, 395, 1 L.Ed.2d 456 (1957), Federal has set forth that a not insubstantial amount of interstate commerce was involved. Federal has adequately averred that it was coerced by Robbins into buying undesired components, that it suffered injury to its business as a result, and that this injury was directly related to Robbins' tying arrangement. In short, defendant has alleged facts which would describe an illegal tying arrangement, the ability of Robbins to require purchase of a tied product, and adverse competitive consequences that resulted therefrom. Therefore, defendant has standing to maintain an antitrust action and, in particular, its causes of action under Section 3 of the Clayton Act and Section 1 of the Sherman Act.

### 4. Federal's Motion for Class Action Determination

In Count III, Federal seeks to represent all present and former Robbins' distributors and obtain relief for them from Robbins' antitrust violations. Robbins challenges Federal's motion for class action determination by arguing that Federal is particularly unsuited to be the class representative. For support, plaintiff alleges that Federal's financial position severely restricts its ability to represent adequately the purported class,[10] charges that the counterclaim is mo-

---

8. 15 U.S.C. § 15 provides:

 Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district of the United States . . .

9. *U. S. v. Loew's, Inc.,* 371 U.S. 38, 45, 83 S.Ct. 97, 102, 9 L.Ed.2d 11 (1962); *Northern Pacific Railway,* supra, 356 U.S. at 11, 78 S.Ct. 514; *Times-Picayune,* supra, 345 U.S. at 608–609, 73 S.Ct. 872.

10. Discussion on this point is unnecessary in light of my holding below that class certification is barred by conflicting interests. In any case, I find that Federal's resources would be sufficient to control the litigation and provide adequate notice to the class members and that its counsel are highly qualified, experienced and quite able to conduct the proposed litigation, as required by *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

tivated solely by revenge, and avers that Federal, as a nondistributor, has interests in conflict with and antagonistic toward the interests of those class members currently operating under a distributor agreement with Robbins. I find this last point valid and sufficient to bar class certification.

■ To be maintainable as a class action, a suit must meet all of the mandatory requirements of Rule 23(a) and, in addition, fall within one of the Rule 23(b) subsections. Defendant, as movant on the class action motion, bears the burden of demonstrating the propriety of class action treatment. *Chevalier v. Baird Savings Assoc.*, 72 F.R.D. 140, 144 (E.D.Pa.1976); *Chestnut Fleet Rentals, Inc. v. Hertz Corp.*, 72 F.R.D. 541, 543 (E.D.Pa.1976). Federal asserts that the Rule 23(a) requirements have been met and that the action is maintainable under subsection 23(b)(3).

■ The absence of conflicting interests between the representative party and the proposed class members is essential for class action certification under the requirement of Rule 23(a)(4). This rule requires the representative party to protect the interests of the class fairly and adequately. It envisions a plaintiff who will vigorously prosecute the action without bartering away or compromising the case for selfish reasons, *Collins v. Signetics Corp.*, Civil Action No. 75–1443 (E.D.Pa., October 1, 1976), slip op. at 2–3, and one who will have no interests which may be antagonistic to those of the person or persons he purports to represent. *William Penn Man. Corp. v. Provident Fund for Income, Inc.*, 68 F.R.D. 456 (E.D.Pa.1975).

My learned colleague, Judge VanArtsdalen, recently had occasion in *Aamco Automatic Transmissions, Inc. v. Tayloe*, 67 F.R.D. 440 (1975), to address the issue of whether a former franchisee may properly represent a class consisting of both former and present franchisees and his conclusion that such representation could not be permitted is most persuasive. While pointing out that each case must be judged on its own facts, Judge VanArtsdalen found that recent decisions [11] dealing with this question had uniformly refused to allow the non-franchisee to maintain he action for an all-inclusive class.[12] 67 F.R.D. at 445–46.

■ It is evident, as plaintiff argues, that Federal's interests here conflict with those whom it wishes to represent. First, current franchisees would be concerned about the continued financial health of their franchisor and would not seek a large monetary recovery while Federal, no longer dependent on Robbins' products, would strive for the maximum monetary award without regard to the possible effect such an award could have on the Robbins' franchise system. Second, Robbins contends that Federal's trial strategy as a non-franchisee would conflict with the strategy most desirable for the franchisees. For example, speed would favor the dealers because they would desire an immediate contract adjustment and continuous business dealings with their manufacturer. But delay would favor Federal, because the sooner the case came to an end, the sooner it would have to satisfy the $76,000. debt to Robbins. Finally, there is the possibility that Federal could settle this debt—despite the stipulation that Robbins is entitled to judgment in that amount—in return for a premature termination of the antitrust action and thereby secure relief having no benefit to the remainder of the class. These conflicting interests preclude any finding that Fed-

11. See, e. g., *DiCostanzo v. Hertz Corp.*, 63 F.R.D. 150 (D.Mass.1974); *Matarazzo v. Friendly Ice Cream Corp.*, 62 F.R.D. 65 (E.D.N.Y.1974); *McMackin v. Schwinn Bicycle Co.*, 354 F.Supp. 1154 (N.D.Ill.1973); *Seligson v. Plum Tree, Inc.*, 61 F.R.D. 343 (E.D.Pa.1973); *Van Allen v. Circle K Corp.*, 58 F.R.D. 562 (C.D.Cal.1972); *Free World Foreign Cars, Inc. v. Alfa Romeo*, 55 F.R.D. 26 (S.D.N.Y.1972).

12. Judge VanArtsdalen also distinguished two cases which had permitted an all-inclusive class. See *Ungar v. Dunkin' Donuts of America, Inc.*, 68 F.R.D. 65 (E.D.Pa.1975), rev'd 531 F.2d 1211 (3d Cir.), cert. denied 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976); *Herrmann v. Atlantic Richfield Co.*, 65 F.R.D. 585 (W.D.Pa.1974). In each of these cases, the representative plaintiffs included both former and present franchisees.

eral would protect the interests of all members of the proposed class as required by Rule 23(a)(4).[13] Therefore, defendant is not a proper class representative and it may not maintain Count III as a class action.

### 5. Federal's Motion to Stay Execution of Judgment

Although Federal stipulated to the entry of partial summary judgment, see note 1, supra, it also represented that its financial position prevented immediate satisfaction of the judgment and that any execution on the debt would force its business into liquidation. Following its failure to secure a bond which would have maintained the status quo and protected Robbins' position as a creditor, Federal filed a motion to stay execution under Fed.R.Civ.P. 62(h) until its counterclaim has been resolved.

 A motion for a stay of execution under Rule 62(h) is directed to the discretion of the court.[14]

. . . [T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance. *Landis v. North American Co.,* 299 U.S. 248, 255–56, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936) (Cardozo, J.).

"Among these competing interests are the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the

orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *Bailey v. United States,* 415 F.Supp. 1305, 1315 n.33 (D.N.J.1976), quoting *CMAX, Inc. v. Hall,* 300 F.2d 265, 268 (9th Cir. 1962).

 The power to stay execution should be exercised with caution and never unless the case is plain and the equity of the party seeking it free from doubt or difficulty. A stay of execution is ordinarily temporary in nature. The exercise of judicial discretion in staying the execution of a judgment must be founded not upon an individual judge's abstract ideas of justice, but upon principles recognized at law or in equity. A stay in one case until the determination of another will not be granted on slight foundation, although a reasonable stay may be granted to afford an opportunity to establish a claim. For example, stays of execution may be granted to protect a defendant in a cross-action against a plaintiff or so that a set-off can be presented and adjudicated. 30 Am.Jur.2d *Executions* §§ 693 to 701 (1967); see also 33 C.J.S. *Executions* § 139 (1942).

 After weighing all the competing interests involved here, I conclude Federal's motion for stay of execution must be refused.

A hearing was held on this motion during which Federal's president and accountant testified concerning the business, its sales, profits, and ability to pay debts. Accepting what they said as true, Federal is an ongoing, viable concern purchased as such by its present owner from his wife's family in

---

**13.** This would not disqualify Federal from representing a class of former Robbins franchisees, to which the above-mentioned conflicting interests would not exist. However, there has been no allegation that the class of 50 alleged by defendant contains any non-franchisees other than Federal. Should Federal demonstrate the existence of other former franchisees which might be interested in pursuing the counterclaim and in such a number that the numerosity requirements of Rule 23(a) would be satisfied, I will entertain a motion to certify a class consisting of former franchisees.

**14.** Rule 62(h) provides:

When a court has ordered a final judgment under the conditions stated in Rule 54(b), the court may stay enforcement of that judgment until the entering of a subsequent judgment or judgments and may prescribe such conditions as are necessary to secure the benefit thereof to the party in whose favor the judgment is entered.

1973. Its fiscal year runs from August 1 to July 31.

For fiscal 1975, net sales were $675,000 and profits $1,582. Sales for fiscal 1976 were $850,000, netting a profit of $1,211. The projected sales figure for 1977 was $1.1 million which would yield a profit of $10,-000. The company's present backlog makes a projection of $1.4 to $1.5 million in sales for fiscal 1978 realistic. To break even, the company must have annual sales of $800,-000 in the future. Business at that level, however, would not provide any funds for the reduction of the debt to Robbins until after Federal's other debts have been materially discharged. Therefore, unless sales greatly increase beyond $800,000, Federal's first payment on the debt to Robbins cannot be made for approximately 10 years and cannot be concluded until about four years thereafter. As a result of his knowledge of Robbins' modest profits, large debt structure, and sales forecasts, its accountant stated that execution would mean forced liquidation with consequent losses for creditors and owners.

Although Federal's bleak financial picture supports its claim that execution by Robbins would result in business ruin, it has offered no acceptable plan for the judgment's satisfaction. Three possible sources of payment are apparent, however:

1. if a sales level of $1.5 million can be achieved for the next five years, the debt can be paid by the end of 1983;

2. if sales total between $800,000 and $1 million a year, Robbins will have to wait approximately 10 years to receive its first instalment with total satisfaction to be achieved four years thereafter; and

3. payment could be made from the amount Federal hopes to recover from Robbins on the counterclaim.

Until the matter is resolved, Robbins remains an unwilling investor in Federal's business. Obviously, five years is too long to require Robbins to wait—14 years, that much worse.

The third possibility, payment from whatever may be recovered on the counterclaim, is elusive and uncertain.

The counterclaim contains three counts, each asserting a separate cause of action. Count I charges damage to reputation and loss of business from Robbins' reduction of credit to Federal. Count II asserts that this cutting of credit amounted to a violation of the Robinson-Patman Act, and Count III alleges the illegal tying arrangement between Robbins' products and components.

Nothing was presented at the hearing or by way of documentary evidence to substantiate or even illustrate the weight of Federal's claims. For example, although Federal contends in Count I that it lost business and suffered damage to its reputation there is no averment, much less proof, of how much was lost or when. There is nothing that names names or states numbers. Federal may be seeking damages for the loss of one customer who cancelled an order for a squash court or it may contend it is entitled to lost profits arising from its inability to provide floors for 50 gymnasiums. The record does not present the vaguest idea what Federal claims it should recover on Counts I and II, much less what a realistic appraisal of its possibilities might be.

Any estimate as to the value of Count III would be equally speculative. No figures were presented to show what percent of Federal's total purchases from Robbins were represented by flooring components, the products it alleges were tied to Robbins' sales of floors. There was no showing of how much these components would have cost from other sources and thus no way in which any computations could be made of the range of possible recovery by Federal on Count III. Much less, was any reference made to the quantity, quality, nature, or source of any proof that actual tying did exist—an allegation which plaintiff has denied and has offered an affidavit to refute.

At best, therefore, the possibility of recovery on the counterclaim is a hopeful gleam of undefined magnitude in Federal's eye—and one which will take time and considerable discovery to establish. This action

was started by Robbins in November, 975, to collect moneys due on shipments allegedly made as far back as 1973. Considering the nature of most antitrust cases and the discovery required before trial, it is doubtful that this matter could be heard in less than six months—and that is probably rank optimism. On the one hand there is the certainty that Federal will be unable to retire Robbins' debt from ordinary revenue in less than five years, the uncertainty of Federal's counterclaim, and the time which will be required to advance it. On the other hand, the parties have agreed since February, 1977, that Federal owes Robbins $76,767.61. To delay execution will mean that Robbins must continue to be an unwilling investor in Federal's affairs.

Under all the circumstances, the stay must be refused.

### 6. Conclusion

Since it has been uniformly held that differing credit terms are not violations of Sections 2(d) and (e) of the Robinson-Patman Act, I shall follow that line of reasoning in this case and grant plaintiff's motion to dismiss defendant's cause of action under those sections. But no case has been cited to me which categorically denies defendant the right to maintain its cause of action under Section 2(a). It is entirely possible that Robbins used its credit policies in such a way as to injure Federal. At this stage in the proceeding, it is too early to hold otherwise, and I must permit Federal to assert its Section 2(a) claim in Count II. Federal has amply demonstrated that it is a party for whose protection the antitrust laws were enacted. Because it has sufficiently alleged the necessary elements for maintenance of a suit by a private party, Federal's causes of action under the Clayton Act and Sherman Act in Count III must stand. But defendant may not be permitted to maintain Count III as a class action because Federal would not be an adequate representative of present franchisees.

Finally, Federal has shown nothing which would justify a stay of execution under Rule 62(h).

### On Motion for Reargument

DITTER, District Judge.

Defendants have filed a motion for reargument[1] asking for reconsideration of my refusal to grant a stay of execution and asking for a limited stay of 180 days. The instant motion must also be refused.

In support of their motion, defendants presented the affidavit of James Aurino who had testified on a prior occasion he was president of the debtor and one of its principals. In summary this affidavit sets forth that during the four years that Federal was an authorized distributor of Robbins' products, it purchased component parts, the cost of which together with freight charges came to $209,000. According to the affidavit, ". . . said component parts could have been purchased in the Philadelphia area for a total price of One Hundred Fourteen Thousand Dollars ($114,000.00)." No freight charges would have been required and thus the net effect was that Federal paid Robbins $95,000. more than the same material would have cost in the open market.

The affidavit then cites a letter from Robbins dated May 28, 1975, in which a representative of Robbins states it will only guarantee flooring installations if it supplies the principal components used. Mr. Aurino cites this letter to show that as a practical matter, Federal could not have purchased component parts from a source other than Robbins.

The affidavit goes on to assert additional information in support of defendants' claim that the constriction by Robbins of Federal's credit brought extensive losses. In this regard, the affidavit says that when Robbins reduced credit to Federal, Federal had outstanding approximately $750,000. in contracts and had contracted for materials from Robbins costing $290,000. to fulfill

---

1. The motion is filed "pursuant to Local Rule 37." Since new facts are offered by way of

affidavit, the motion is not really for reargument.

these contracts. The affidavit then states that since the material had to be purchased from other sources at a price increased by 13.4%, Federal had a total increase in cost of $76,000.

Assuming for the sake of argument that all that Mr. Aurino says is true, the affidavit is insufficient to warrant even a temporary stay of execution. So far as defendants' claim of an illegal tie-in is concerned, there is no assertion in the affidavit that Federal ever wanted or tried to purchase component parts from another source, much less that it could have done so and still have obtained the same quality, quantities, or credit which Federal supplied. There is no assertion that Robbins coerced Federal at all. See *Ungar v. Dunkin' Donuts of America, Inc.,* 531 F.2d 1211 (3d Cir.), cert. denied 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976). While the letter of May 28, 1975, is cited to prove a tie-in, it also demonstrates that Federal's inquiry concerning the possibility of purchasing component parts from some other source was not made until shortly before the letter was written. The conclusion is inescapable that while some other source might have supplied components, Federal made no effort to obtain them except from Robbins. Moreover, the letter also shows certain minor components could have been purchased from others without Robbins' objecting and, in any event, the only penalty for failing to purchase major components would be a refusal by Robbins to provide a guarantee for the particular installation in which its components were not used.

While the affidavit asserts Federal's loss of credit cost it $76,000. through increased material costs, Federal's own figures are to the contrary. One hundred thirteen and four tenths percent (113.4%) of $290,000. is $328,860., an increase of $38,860. and not $76,000.

Regretfully, the affidavit contains no real information as to the size or strength of Federal's counterclaim. Defendants' motion for reargument must be refused.