**CONOCO INC., Appellee,**

v.

**INMAN OIL COMPANY, INC. and Ronald C. Inman, Appellants.**

No. 84–2221.

United States Court of Appeals, Eighth Circuit.

Submitted June 13, 1985.

Decided Oct. 9, 1985.

896

James D. Edgar, St. Louis, Mo., for appellants.

Jerry Ashby, Houston, Tex., for appellee.

Before ROSS, Circuit Judge, BRIGHT, Senior Circuit Judge, and NICHOL,* Senior District Judge.

NICHOL, Senior District Judge.

Conoco brought this diversity action against Inman Oil Company (Inman Oil) and Ronald C. Inman, individually, for recovery of monies due Conoco for petroleum products delivered to the defendants. At trial Inman Oil asserted eight counterclaims, including allegations of federal and state antitrust violations, tortious interference with business relationships, breach of contract and misrepresentations. The magistrate[1] ruled in favor of Conoco on all claims.

On appeal, Inman Oil contends the magistrate erred in holding (1) that Conoco did not violate the Robinson-Patman Act; (2) that Conoco did not attempt to monopolize the sale of lubricants in the Viburnum Trend in violation of section 2 of the Sherman Act; (3) that Conoco did not tortiously interfere with Inman Oil's prospective business relations with St. Joe Minerals Corp.; and (4) that Conoco did not breach its Jobber Franchise Agreement with Inman Oil.

Additionally, Inman Oil asserts error in the magistrate's failure to rule on two of Ronald C. Inman's affirmative defenses. For the reasons set forth below, we affirm the magistrate's decision on all issues except that of breach of contract; we find that Conoco breached its implied obligation of good faith and fair dealing, and hence remand the cause for a determination of damages.

## BACKGROUND

For many years, the State of Missouri has been the leading lead producer in the United States. An area known as the Viburnum Trend, located in the remote Ozark Mountain region of the State, contains one of the largest and most productive belts of lead ore. Four major lead mining companies operate in the Viburnum Trend—St. Joe Minerals Corp. (St. Joe), the Amax Lead Company of Missouri (Amax), Cominco-American, Inc. (Cominco), and the Ozark Lead Company (Ozark Lead). The lead mining industry has large and specialized requirements for petroleum products, especially machinery lubricants. The central disputes in this case revolve around the market for these lubricants.

Inman Oil is a distributor of petroleum products, head-quartered in Salem, Missouri. Commonly known as a "jobber," Inman Oil purchases petroleum products from suppliers such as Conoco and resells them to users either directly or indirectly through retail outlets such as service stations. Jobbers in the oil industry customarily distribute products of more than one supplier.

Conoco markets its petroleum products through two unincorporated groups within the company. The Branded Division Operations (Branded Division) markets Conoco products through intermediate jobbers or distributors such as Inman Oil. The

---

* The HONORABLE FRED J. NICHOL, Senior United States District Judge for the District of South Dakota, sitting by designation.

1. The Honorable David D. Noce, United States Magistrate. The case was tried to the magistrate with the parties' consent, and the appeal is taken directly from the magistrate's judgment to this Court pursuant to 28 U.S.C. section 636(c)(3) and Rule 73(c) of the Federal Rules of Civil Procedure.

Wholesale and Commercial Operations (WCO) sells petroleum products directly to large commercial and industrial users. Since at least 1967, these two Conoco divisions have been under separate administrative control and have competed against each other for many of the same commercial accounts. Products sold by WCO to Viburnum Trend customers are delivered to the site by Conoco's consignment delivery agent, Consolidated Industrial Equipment Company (Consolidated).

During the period from 1967 to 1972, Inman Oil[2] obtained most of its petroleum products from Sinclair Oil Company and Shell Oil Company. It was a major distributor of these products to all four lead mining companies in the Viburnum Trend. Since 1956, Inman Oil has supplied St. Joe with all of its petroleum products except bulk lubricants. Conoco during this period was competing as a supplier for Viburnum Trend business, with intermittent success. Competition was stiff—some seven oil suppliers were vying for the business of the four lead mining companies. By 1972, Conoco's WCO had at least a portion of the business at Amax and Cominco. Since the lead mining companies generally solicited bids each year, there were no long-term contracts between the mining companies and either oil suppliers or jobbers.

On October 18, 1972, Inman Oil entered into a Jobber Franchise Agreement (JFA) with Conoco. Under the agreement, Inman Oil received the right to obtain from Conoco and sell to its customers certain Conoco petroleum and nonpetroleum products. The jobber was given the right to display Conoco's trade names and trademarks. Conoco was obligated to deliver a certain annual volume of products in accordance with pricing and credit terms set forth in Exhibit A of the agreement. Conoco also agreed

to make available to Inman Oil the advice and counsel of lubricant engineers (persons with expertise in the use of machinery lubricants) and other Conoco personnel concerning problems related to the jobber's operation.

The JFA contained several provisions indicating Conoco's intent to further the successful business operations of Inman Oil. The agreement's "Statement of Purposes and Mutual Objectives" stated that, because Conoco's success was linked with and dependent upon jobbers who were identified with Conoco by the public, Conoco "undertakes its obligations hereunder to the end of promoting the success of [Inman Oil]."

The agreement also included a Distributor Development Philosophy which provided in part: "Emphasis will be directed toward achievement of market improvement in areas where potential for profit is best for both the company and its distributors.... Conoco personnel will work with distributors to keep agreed upon plans on the track and to help assure the progress toward achievement of sales and profit objectives of both the distributor and the company." Additionally, the JFA provided for special prices to be given to Inman Oil so that it could make competitive distribution bids to its customers.

In 1972, Conoco's WCO was selling substantial amounts of petroleum products to Cominco and Amax but had yet to obtain any business with St. Joe, the largest of the lead mining companies, or with Ozark Lead. Inman Oil, on the other hand, was supplying all of St. Joe's packaged lubricant needs with Sinclair products.[3] Subsequent to the execution of the 1972 JFA, in a series of meetings between Inman Oil and Conoco personnel, Inman Oil agreed to

---

**2.** From 1965 until 1974, Inman Oil was known as Inman-Anderson Oil Company. In 1974, the company reverted to its original name of Inman Oil Company, for reasons unrelated to this litigation. For convenience, the company will be referred to throughout this opinion as Inman Oil.

**3.** The petroleum products pertinent to this litigation come in three types by degree of refinement—gasoline; diesel fuel (kerosene and heating oil); and lubricants (greases, motor oils, hydraulic oils and the like). Lubricants are delivered to industrial consumers either in bulk or in packaged form. The lead mining companies generally require some volume of lubricant in both forms.

cooperate in Conoco's attempt to persuade St. Joe to switch from Sinclair to Conoco as its source of packaged lubricants. This effort was successful; St. Joe became an indirect Branded Division customer and Inman Oil began supplying St. Joe with Conoco packaged lubricants.

The events giving rise to this litigation took place over a period of ten years, from 1972 to 1982. They fall into four general categories: (1) the bidding history; (2) the various JFA's; (3) Inman Oil's financial problems; and (4) Conoco's freight allowance policy.

*The Bidding History*

As noted above, by 1972 Conoco's WCO had a substantial portion of the Amax and Cominco business, and Conoco's Branded Division had obtained the St. Joe packaged lubricant business with Inman Oil as its jobber. From 1973 to 1976, during the oil embargo, petroleum distribution came under heavy federal government control. Competition diminished during this period and suppliers maintained the same customers. When the embargo was lifted, competition resumed and became quite vigorous. From 1976 on, Conoco's WCO bid on lubricants in the Viburnum Trend at prices equal to or below Inman Oil's cost for the same products. WCO was able to do this because it absorbed the $0.12 per gallon cost of having its consignee, Consolidated, deliver and maintain a standing inventory of Conoco products. This cost would normally have been included in the delivered price.

It appears, however, that this pricing policy met with little success until 1980. From 1976 to 1980, Conoco's WCO, bidding for direct sales to the lead mining companies, competed with Conoco's Branded Division, bidding with Inman Oil for the same customers. Inman Oil managed to hold on to its St. Joe packaged lubricant business while WCO retained most of its Amax and Cominco contracts. Neither group obtained any new business during this period, although Inman Oil in its capacity as jobber for other oil suppliers did acquire some

new contracts and by 1980 was supplying all of St. Joe's petroleum products.

Like the other lead mining companies, St. Joe actively solicited bids every year from all the oil suppliers in the area for all its petroleum needs. Evidently, however, 1980 was the first time that WCO bid against Inman Oil for the St. Joe packaged lubricant contract then held by Inman Oil in conjunction with the Branded Division. Before submitting this bid, WCO wrote to Branded advising the latter of its plan and acknowledging the potential for conflict. The record reveals no protest by Branded.

Thus, in 1980, WCO submitted bids for the St. Joe bulk hydraulic oil and packaged lubricant contracts, using its below-jobber-price quotations. WCO received the St. Joe bulk hydraulic oil contract for 1981, giving the delivery business to Consolidated, its consignee, rather than to Inman Oil. Also for the 1981 contract year, Inman Oil retained its St. Joe packaged lubricant contract (supplied by Conoco) and obtained the St. Joe bulk motor oil business with Sun Oil as supplier. St. Joe had recently switched approximately 50% of its packaged lubricant consumption to bulk motor oil. As a result, while Inman Oil remained in a good position because it was supplying both Conoco packaged lubricants and Sun Oil bulk motor oil to St. Joe, Conoco's position had deteriorated, since the total volume of Conoco products being purchased by St. Joe had decreased by half.

Consequently, Conoco stepped up its competitive efforts. In late 1980, Branded officials requested a meeting with WCO officials to discuss Inman Oil and the possibility of cooperation between Branded and WCO. (The record does not indicate whether this meeting took place nor the content of any discussion.) In 1981, WCO bid low for the 1982 St. Joe packaged lubricant contract, and this time was successful. WCO again gave the delivery business to Consolidated rather than Inman Oil. WCO lost the 1982 Amax business to Mobil Oil and lost its bid for the St. Joe hydraulic oil contract to Sun Oil with Inman Oil as the delivery agent.

However, despite Inman Oil's contract to deliver Sun hydraulic oil to St. Joe, the loss of its lucrative, long-time St. Joe packaged lubricant account was a significant blow. Inman Oil went out of business on February 28, 1982.

*The Various JFA's*

As noted earlier, the first JFA between Conoco and Inman Oil was executed in 1972. Inman Oil became a Conoco jobber, thus estabishing its relationship with Conoco's Branded Division. The 1972 agreement contained three provisions relevant to this case and described above—the reference to Conoco's obligation to promote Inman Oil's success; the Distributor Development Philosophy; and the provision for special prices to jobbers to enable them to compete.

■ Conoco and Inman Oil remained in a contractual relationship with each other continuously until Inman Oil went out of business in 1982. However, the terms of the contract changed several times. Old JFA's were cancelled and new ones executed in 1975, 1977, 1979, and 1981. The Distributor Development Philosophy appears again in the 1975 JFA but not in any of the later agreements. Inman Oil argues, and we agree, that this provision is nevertheless a part of the 1977 JFA because that agreement expressly stated that it revoked prior agreements only to the extent they were inconsistent with it. Nothing in the 1977 JFA indicated that the Distributor Development Philosophy had been revoked or altered in any manner, nor does there appear to be any inconsistency.[4] The special price provision was renewed in the 1975 JFA but in none of the later contracts. The "promoting success" provision, however, is contained in every one of the subsequent JFA's.

*Inman Oil's Financial Problems*

With the execution of the 1972 JFA, Conoco extended a credit limit of $100,000 to Inman Oil. Conoco generally takes a considerable interest in the financial condition of its jobbers to whom it extends credit, often requiring regular financial statements so as to assess its credit risk. If a jobber's profits or net worth appear to be decreasing, it may first be placed on a "numbers system," a system which apparently consists of a reduction of the jobber's credit limit and strict controls on the jobber's use of its credit. If its financial situation does not improve, the jobber may then be placed on a cash in advance basis with no credit being extended. Credit can be restored upon a satisfactory showing of fiscal strength through the furnishing of financial information.

In April of 1974, Inman Oil remained in good financial position and Conoco increased its credit limit to $200,000. However, intermittently from December 1972 through late 1980, Inman Oil encountered various financial difficulties including depressed profits and occasional losses, decreasing accounts receivable, and increasing expenses. Its financial statements were routinely overdue. As a result, Inman Oil was placed on the numbers system in May of 1975.

Meetings were held between Conoco and Inman Oil officials to discuss methods of improving the latter's financial status but these met with little success and in July, 1976, Inman Oil was placed on a cash in advance basis. (At that time Inman Oil paid the $100,000 it then owed Conoco.) By August of 1977, Inman Oil's financial condition had improved sufficiently that Conoco placed it back on the numbers system with a $100,000 credit limit. In October, 1979, Conoco offered to remove the restrictions of the numbers system but Inman Oil voluntarily remained on the system because it was helpful to Inman Oil's cash flow position. Finally, in late 1980, the jobber was off the numbers system altogether and by April of 1981, Conoco

---

**4.** Although Inman Oil does not raise the point, we note that the 1979 JFA contains the same language. Thus, under our interpretation, the Distributor Development Philosophy would also be a part of the 1979 JFA. The 1981 JFA revokes all prior agreements without qualification.

had increased Inman Oil's credit limit to $900,000.

*Conoco's Freight Allowance Policy*

Until 1979, Conoco priced its petroleum products to jobbers f.o.b. the jobber's destination. In other words, the price included the cost of transporting the products from the supply point to a Conoco terminal and from the terminal to the jobber's destination. Several jobbers, including Inman Oil, preferred to take delivery at the terminals and use their own trucks to haul the product to the destination. The price to these jobbers still included the transportation costs from terminal to destination. However, Conoco credited these jobbers with an amount equal to the lowest published truck tariff from shipping point to destination in effect on the date of shipment. This credit was the jobber's freight allowance.

In 1979, after six months' notice to all jobbers including Inman Oil, Conoco began pricing its middle distillate petroleum products (diesel fuel and fuel oil) f.o.b. the terminal. Similarly, in 1981 after two months' notice to jobbers, Conoco began pricing its gasoline f.o.b. the terminal and its packaged lubricants f.o.b. the supply point. The price of these products was accordingly reduced to reflect the cost of transportation only as far as the f.o.b. point, and the freight allowance was correspondingly eliminated. Jobbers such as Inman Oil thus continued to transport the products themselves, paid a lower purchase price than before, and no longer received a freight allowance.

## DISCUSSION

The conduct of Conoco about which Inman Oil complains the most in this appeal may be condensed as follows: From 1976 on, Conoco's WCO bypassed Inman Oil in its capacity as a Conoco jobber and solicited Viburnum Trend customers for direct sales of petroleum products; WCO did ths by setting its base price for these customers at or below the base price of the same products for Inman Oil and in some instances by absorbing certain costs; this effort succeeded to the extent that WCO

eventually obtained Inman Oil's plum long-term customer, St. Joe. These facts, Inman Oil argues, constitute proof that Conoco engaged in price discrimination in violation of section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. section 13(a); attempted to monopolize the sale of petroleum products in the Viburnum Trend in violation of section 2 of the Sherman Act, 15 U.S.C. section 2; tortiously interfered with Inman Oil's business relations and expectancies; and breached the various JFA's between Conoco and Inman Oil, particularly the implied obligation of good faith and fair dealing. These issues will be addressed individually, followed by a discussion of Inman Oil's contention that the magistrate improperly failed to rule on two of Ronald C. Inman's affirmative defenses.

*The Robinson-Patman Act Claim*

The Robinson-Patman Act makes it unlawful "either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them...." 15 U.S.C. section 13(a).

 A Robinson-Patman violation consists essentially of two elements: (1) price discrimination, and (2) the requisite injury to competition as a result. *See, e.g., Falls City Industries, Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1984); *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1040 (9th Cir.1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982). "Price discrimination" within the meaning of the statute is nothing more than a difference in price between items of like grade and quality. *FTC v. Anheuser-Busch, Inc.,* 363 U.S.

536, 549, 80 S.Ct. 1267, 1274, 4 L.Ed.2d 1385 (1960). The only difficulty in determining whether price discrimination exists in this case lies in defining "price."

The magistrate's opinion relates two specific instances of alleged price discrimination by Conoco, one involving St. Joe and the other involving Amax. In the fall of 1980, Conoco's WCO bid for and was awarded the St. Joe bulk hydraulic oil contract for 1981. WCO sold the oil to St. Joe at $1.80 per gallon delivered to the St. Joe mine in the Viburnum Trend. During the same period, Conoco sold the same product to Inman Oil at $1.70 per gallon f.o.b. the supply point. Since it cost Inman Oil $0.10 per gallon to transport the product from the supply point to the Viburnum Trend, the "actual delivered" price to both parties was the same. However, because Conoco delivered the St. Joe oil to the mine site, it incurred additional costs of $0.12 per gallon to store and maintain an inventory of the product with its on-site agent, Consolidated. These costs were absorbed by Conoco and were not reflected in its $1.80 price to St. Joe. Thus, the "net price" received by Conoco from St. Joe was $0.12 per gallon less, or $1.68 per gallon. The Amax incident entailed substantially the same facts.

■ Inman Oil contends that price, for purposes of the Robinson-Patman Act, means net price; otherwise, price discrimination may occur in subtle forms such as discounts, freight allowances, or credit terms and yet never be reachable by the Act. Conoco argues that the $0.12 per gallon represented internal operating costs which are irrelevant in determining price discrimination. The magistrate found that the relevant figure was "the amount actually paid by the buyer, *i.e.* invoice price less any discounts or allowances not reflected in the invoice price." *Conoco, Inc. v. Inman Oil Co.*, No. 82–1133, slip op. at 68 (E.D.Mo. Aug. 29, 1984). We agree and hold that price under the Robinson-Patman Act is the "net price" received by the seller.

The plain language of the statute prohibits indirect as well as direct price discrimination. 15 U.S.C. section 13(a). Under the interpretation urged by Conoco, a seller could easily circumvent the statutory proscription by defraying actual delivery costs for his preferred customers while quoting f.o.b. supply point or terminal prices to his less favored customers. *See Guyott Co. v. Texaco, Inc.*, 261 F.Supp. 942, 949 (D.Conn. 1966). The *Guyott* court quoted from the views of one of the statute's authors:

> In order properly to compare two or more transactions of a seller with two or more of his customers, for the purpose of determining whether price discrimination is involved, the prices must be reduced to a common denominator. In other words, an effort should be made to determine whether the difference in the prices reflects an allowance for the cost of the transportation involved. Then we have a common denominator: the net price received by the seller from the two buyers in question.

Patman, Complete Guide to the Robinson-Patman Act 14 (1963). *Cf. American Can Co. v. Russellville Canning Co.*, 191 F.2d 38, 54 (8th Cir.1951) (Court found that seller's practice of absorbing a fixed portion of freight costs to a certain basing point, then charging variable freight prices to customers for delivering the product from the basing point to their destinations, was price discrimination). Thus, the first element of a Robinson-Patman violation, price discrimination, was established.

■ The Act does not prohibit mere price discrimination, however. To amount to a violation, the discrimination must be shown to have caused the requisite injury to competition. *William Inglis, supra*, 668 F.2d at 1040. The statute is concerned with the protection of competition on three levels: (1) competition with the seller who granted the discriminatory prices (primary line); (2) competition with the seller's purchaser who received the favorable lower price (secondary line); and (3) competition with a customer of the favored purchaser (tertiary line). 15 U.S.C. section 13(a). *See generally William Inglis, supra*, 668 F.2d at 1040 & n. 46; Hansen, *Robinson-Patman Law:*

*A Review and Analysis,* 51 Fordham L.Rev. 1113, 1133 (1983).

In the case at bar, Inman Oil alleges only a primary line injury. Specifically, Inman Oil argues that because St. Joe, the customer receiving the favored price from Conoco, was also a customer of Inman Oil, Inman Oil was in competition with Conoco, the seller granting the favored price. It was this primary line competition, according to Inman Oil, which was injured by Conoco's price discrimination. Conoco asserts, and the magistrate ruled, that Inman Oil has not shown the required adverse effect on competition because Inman Oil and Conoco were not competitors. Under this theory, even if Conoco had charged the same price to Inman Oil that it charged to St. Joe and the other lead mining companies, Inman Oil would have had to raise its price on resale to make any profit. And, as the magistrate observed, because competition in the Viburnum Trend was such that price level was the determinative factor in the awarding of contracts, Inman Oil could not have made any sales at the higher price it would have had to charge. Thus, Conoco argues there was no real competition between it and Inman Oil and therefore no injury to competition resulting from Conoco's price discrimination.

Conoco relies for this argument primarily on *Secatore's, Inc. v. Esso Standard Oil Co.,* 171 F.Supp. 665 (D.Mass.1959). In *Secatore's,* the plaintiff operated two retail gasoline stations. Its customers drove their vehicles to the stations and had gasoline pumped into the tanks. The plaintiff had no facilities for delivering gasoline off its premises. The defendant was a refiner and distributor of petroleum products. It sold gasoline to customers who took delivery in their own tank trucks at defendant's refinery and also delivered gasoline in its tank trucks to customers, including the plaintiff, who had storage tanks and pumps on their premises. The plaintiff alleged that the defendant had violated the Robinson-Patman Act by selling to large commercial consumer customers at prices lower than it charged the plaintiff. The plaintiff had never sold or tried to sell to these customers and did not have the ability to deliver gasoline to them as defendant did.

The *Secatore's* court rejected the plaintiff's contention that this price differential injured the competition between plaintiff and defendant. Assuming that there was any actual or potential competition between them, the court observed that there would of course be no illegal price discrimination if defendant had sold to the plaintiff at the same price at which it sold to the customers in question. Yet even then the plaintiff could not have successfully competed with the defendant for these customers. As a matter of economics, it would have had to charge more for the gasoline than it paid defendant in order to cover expenses and make a profit. The customers would naturally have chosen the lower price offered by defendant. "If plaintiff cannot successfully compete with defendant for these customers when there is no differential, it is not harmed by any further reduction which defendant may make in the price it charges to them." *Id.* at 667 (citations omitted).

In response, Inman Oil relies on *Guyott Co. v. Texaco, Inc.,* 261 F.Supp. 942 (D.Conn.1966), for its proposition that a distributor can be in primary line competition with its supplier, at least when they have customers in common. The defendant in *Guyott* was a refiner and supplier of petroleum products, including paving asphalt. The plaintiff was a distributor of paving asphalt who sold to customers known as "mixers." The mixers blended the paving asphalt with other ingredients and then either applied the mixture to road beds or sold it to construction contractors. The plaintiff alleged the defendant had violated the Robinson-Patman Act by selling directly to a long-time mixer customer of the plaintiff's at a net price lower than it charged the plaintiff.

In ruling on the defendant's motion for summary judgment, the *Guyott* court acknowledged that " 'the existence of some competitive relationship' between 'sellers of the same product' " was essential to a primary line injury. *Id.* at 950 (quoting

Rowe, Price Discrimination Under the Robinson-Patman Act 142–44 (1962)). The court went on to hold, however, apparently on the basis of the common customer, that the plaintiff had not failed as a matter of law to establish a primary line case. *Id.* The court distinguished *Secatore's* on the grounds that the customers of the disfavored purchaser there were not in competition with either the favored purchaser or his customers, and that the favored purchaser there had never been a customer of the disfavored purchaser. *Id.* at 951.

■ Inman Oil asserts here that the existence of primary line competition between it and Conoco was proven by the fact that St. Joe, the favored purchaser, was previously a customer of Inman Oil, the disfavored purchaser. We think, however, that this fact simply illustrates the precarious position of the "middleman" in our system of market distribution. So long as it is profitable for the supplier of a product to utilize a distributor, business opportunities exist for those companies that wish to pursue them. It strains credulity, however, to suggest that the Robinson-Patman Act was intended to force a supplier to "support" a distributor's business even when it becomes unprofitable to do so. We are not

persuaded by the rationale of the *Guyott* decision, and we find no other authority to support such a proposition. We hold that, for purposes of the Robinson-Patman Act, the distributor in this case was not in primary line competition with its supplier. *See Universal Lite Distributors, Inc. v. Northwest Industries, Inc.,* 452 F.Supp. 1206 (D.Md.1978), *aff'd in relevant part,* 602 F.2d 1173 (4th Cir.1979); *Sano Petroleum Corp. v. American Oil Co.,* 187 F.Supp. 345 (E.D.N.Y.1960).[5]

### The Attempt to Monopolize Claim

■ Section 2 of the Sherman Act, 15 U.S.C. section 2, makes it unlawful to "monopolize, or attempt to monopolize" any part of interstate trade or commerce. To establish the right to recover for attempted monopolization, Inman Oil must prove (1) that Conoco had the specific intent to control prices or destroy competition, (2) that it engaged in predatory or anti-competitive conduct directed to accomplishing the unlawful purpose, and (3) that there was a dangerous probability of success. *Trace X Chemical, Inc. v. Canadian Industries, Inc.,* 738 F.2d 261, 265 (8th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985).[6]

---

5. Because we find there was no competition within the meaning of the statute, we do not reach the question of whether there was the requisite injury to competition.

6. Some conflict exists within our Circuit regarding the exact elements of attempted monopolization. In our leading case of *United States v. Empire Gas Corp.,* 537 F.2d 296, 298–99 (8th Cir.1976), *cert. denied,* 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977), as well as in our most recent discussion of the subject, *National Reporting Co. v. Alderson Reporting Co.,* 763 F.2d 1020, 1025 (8th Cir.1985), we stated the elements as being (1) specific intent to monopolize, and (2) dangerous probability of success in the relevant product and geographic market. In *Trace X Chemical, supra,* however, we included a separate element of predatory conduct and made no reference to the requirement of the relevant market. *Trace X Chemical, supra,* 738 F.2d at 265. The bulk of the circuits combine our two formulations, requiring (1) specific intent, (2) predatory conduct, and (3) dangerous probability of success in the relevant market. *See, e.g., Manufacturing Research Corp. v.*

*Greenlee Tool Co.,* 693 F.2d 1037 (11th Cir. 1982); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014 (9th Cir. 1981), *cert. denied,* 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982); *Lektro-Vend Corp. v. Vendo Corp.,* 660 F.2d 255 (7th Cir.1981); *United States v. Dairymen, Inc.,* 660 F.2d 192 (6th Cir.1981); *Northeastern Tel. Co. v. American Tel. & Tel. Co.,* 651 F.2d 76 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982); *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.,* 614 F.2d 832 (2d Cir.1980); *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.,* 508 F.2d 547 (1st Cir.1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975). *But see Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480 (5th Cir.1984) (requiring relevant market but making no reference to predatory conduct); *RCM Supply Co. v. Hunter Douglas, Inc.,* 686 F.2d 1074 (4th Cir.1982) (same).

The intent element is often proven by inferences drawn from the defendant's conduct. *E.g., Gough v. Rossmoor Corp.,* 585 F.2d 381, 390 (9th Cir.1978), *cert. denied,* 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979). However, even in the presence of direct evidence of intent,

■ The specific intent in question is the intent to control prices or unreasonably restrict competition. *Superturf, Inc. v. Monsanto Co.,* 660 F.2d 1275, 1283 (8th Cir.1981) (citing *Empire Gas, supra,* 537 F.2d at 302). Specific intent may be shown either by direct evidence of intent or by inference from proof of unlawful conduct. *William Inglis, supra,* 668 F.2d at 1027.

Inman Oil argues that several statements made by Perry Jordan, head of Conoco's WCO, prove Conoco's specific intent to control prices or destroy competition. The head of Consolidated, Conoco's consignee, testified that Jordan said on numerous occasions that he intended to drive Inman Oil out of business in the Viburnum Trend, and that he wanted 100% of the lubricant business in the region. The Amax purchasing agent testified that Jordan told him he wanted all of Amax's business. The purchasing agent at St. Joe testified that Jordan stated he wanted 100% of St. Joe's business, and further that he would not give the business to Inman Oil as Conoco's distributor because otherwise he could not control the price of the product.

The magistrate, relying on *Trace X Chemical, supra,* 738 F.2d at 268, ruled that "such statements, unattended by monopolistic conduct, [were] insufficient to establish specific intent...." *Conoco, Inc., supra,* slip op. at 53. In *Trace X Chemical,* however, we said that, even assuming the statements there in question proved anti-competitive intent, *"intent* alone is not enough; anti-competitive conduct or use of monopoly power must also be shown to prove a violation of Section 2 of the Sher-

man Act." *Trace X Chemical, supra,* 768 F.2d at 268 (emphasis added).

The statements here certainly present strong evidence that Perry Jordan desired to dominate in the Viburnum Trend. We have in the past hesitated to rely solely on the hearsay testimony of an interested witness to establish the element of anti-competitive intent. *See Trace X Chemical, supra,* 738 F.2d at 268 and n. 6 (referring to *Agrashell, Inc. v. Hammons Product Co.,* 479 F.2d 269 (8th Cir.), *cert. denied,* 414 U.S. 1022, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973)). Here, several witnesses testified, all of whom were disinterested. Such isolated statements by a single Conoco official, however, whose primary function was to advance WCO's competitive position, are insufficient to prove Conoco's intent to monopolize in the absence of corroborating conduct.

■ Thus, we must decide whether Conoco engaged in predatory or anti-competitive conduct in an effort to control prices or destroy competition. Conduct that will support a claim of attempted monopolization "must be such that its 'anticipated benefits were dependent upon its tendency to discipline or eliminate competition and thereby enhance the firm's long term ability to reap the benefits of monopoly power.'" *Trace X Chemical, supra,* 738 F.2d at 266 (quoting *William Inglis, supra,* 668 F.2d at 1030). Such conduct makes sense only because it eliminates competition. *Id.* Acts which are ordinary business practices typical of those used in a competitive market do not constitute anti-competitive conduct violative of Section 2.

we think a separate showing of predatory or anti-competitive conduct is necessary. Evidence of intent alone can be ambiguous and misleading. The legal sophistication of one defendant may enable it to avoid leaving any documentary trail of improper intent, while another defendant lacking in this sensitivity may "create rich evidence of such intent simply by the clumsy choice of words to describe innocent behavior." Posner, Antitrust Law—An Economic Perspective 189–90 (1976). To maintain the distinction between vigorous competition and unlawful attempts to restrain competition, it must be shown that the defendant pursued its

goals through unfair or predatory means. Thus, we reaffirm our articulation in *Trace X Chemical, supra,* of predatory conduct as a separate element of an attempted monopolization claim.

As will be discussed below, we hold in the case at bar that the element of predatory conduct was not met. For this reason, we do not reach the element of dangerous probability of success, and we therefore decline to determine whether a showing of the relevant market is required in connection with that element. We leave that decision to a case which squarely presents us with the question.

*Id.* (citing *Telex Corp. v. IBM,* 510 F.2d 894, 926 (10th Cir.), *cert. dismissed,* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975)). Inman Oil contends that Conoco's price discrimination against it, Conoco's own jobber, for the purpose of acquiring Inman Oil's long-time customer, St. Joe, constitutes sufficient evidence of anti-competitive conduct.

In bidding against Inman Oil at prices below those it charged the jobber, Conoco was making a competitive offer to a competitor's customer.[7] A competitive offer by its nature involves offering something better than the competitor can provide, such as lower price, better service, greater convenience, etc. The anticipated benefit of Conoco's bidding practice was to obtain customers—a common and legitimate business goal. Inman Oil has not proven that this result depended upon the elimination of it as a competitor.

Nor has Inman Oil shown that Conoco's prices to the lead mining companies were predatory. Predatory pricing has been defined as pricing whereby " 'the firm foregoes short-term profits in order to develop a market position such that the firm can later raise prices and recoup lost profits....' " *William Inglis, supra,* 668 F.2d at 1031 (quoting *Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848, 856 (9th Cir.1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978)). Inman Oil has presented no economic data to indicate that Conoco, by bidding low, forewent profits it would otherwise have made.[8] On the contrary, the evidence in the case suggests that Conoco had to lower its prices in order to maintain itself as a viable competitor in the volatile Viburnum Trend market. The fact that Inman Oil, because it was a distributor rather than a supplier of petroleum products, was unable to also lower its prices cannot be the basis for a finding that Conoco's pricing activity was predatory or anti-competitive. While we sympathize with Inman Oil's misfortune, we are not persuaded that it was the result of unlawful behavior by Conoco.

The three elements of an attempted monopolization claim are conjunctive. Hence, in view of our holding that Conoco did not engage in predatory or anti-competitive conduct, we need not reach the element of dangerous probability of success. *See National Reporting Co., supra,* at 1025.

*The Claim of Intentional Interference with Prospective Business Relations*

Inman Oil next contends that Conoco intentionally interfered with its prospective business relations by bidding against it for the St. Joe contracts. The Missouri courts have defined the elements of this cause of action as follows:

(1) A contract or a valid business relationship or expectancy (not necessarily a contract);

(2) Defendant's knowledge of the contract or relationship;

(3) Intentional interference by the defendant inducing or causing a breach of the contract or relationship;

(4) The absence of justification; and

(5) Damages resulting from defendant's conduct.

*Fischer, Spuhl, Herzwurn & Associates, Inc. v. Forrest T. Jones & Co.,* 586 S.W.2d 310, 315 (Mo.1979).

---

7. The use of the term "competitor" in this context differs from that under the Robinson-Patman Act. There, the statute expressly defines the types of competition cognizable under the Act. The relationship between Inman Oil and Conoco simply does not fit within one of those three categories. Here, in contrast, Inman Oil is a "competitor" of Conoco in the sense that it had a customer desired by Conoco. Thus, our reference here to Inman Oil as a competitor is not inconsistent with our holding above that it could not be in primary line competition with Conoco for purposes of the Robinson-Patman Act.

8. A number of courts have adopted a cost-based approach to determine predatory pricing, influenced by the article by Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697 (1975). *See, e.g., Transamerica Computer Co. v. IBM Corp.,* 698 F.2d 1377 (9th Cir.1983); *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.,* 615 F.2d 427 (7th Cir.1980); *Pacific Engineering & Prod. Co. v. Kerr-McGee Corp.,* 551 F.2d 790 (10th Cir.), *cert. denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977).

■ The magistrate held that Inman Oil had no protectable business expectancy with respect to St. Joe, relying on the highly competitive context of the petroleum business in the Viburnum Trend and the fact that St. Joe and the other lead mining companies annually solicited bids for petroleum products. While it is true that St. Joe offered its business each year to all bidders, it is equally true that for over 20 years the lead mining company gave the majority of its business to Inman Oil. Missouri law requires only a "reasonable expectancy of commercial relations." *Downey v. United Weather Proofing, Inc.,* 253 S.W.2d 976, 980 (Mo.1953); *see also Fischer, supra,* 586 S.W.2d at 315. We think that a 20-year customer relationship with St. Joe created a protectable business expectancy in Inman Oil.

Conoco does not dispute that it knew of this relationship. The interference was clearly intentional since Conoco bid low for the conceded purpose of acquiring St. Joe as a customer—a goal which Conoco knew or was substantially certain would result in interference with the Inman Oil/St. Joe relationship. *See* Restatement (Second) of Torts section 766, comment j (interference is intentional where it "is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action").

The key issue raised in this claim is whether Inman Oil has proved that Conoco's conduct was not justified. Restatement section 768 provides that intentional interference with prospective contractual relations of a competitor is not improper if:

(a) the relation concerns a matter involved in the competition between the actor and the other and

(b) the actor does not employ wrongful means and

(c) his action does not create or continue an unlawful restraint of trade and

(d) his purpose is at least in part to advance his interest in competing with the other.

Thus, competition operates as a privilege justifying an interference with business relations as long as the four stated conditions are met. The question in this appeal is whether Conoco's act of bidding against Inman Oil to obtain for itself Inman Oil's pre-existing customer constitutes "wrongful means." We hold that it does not.

Conoco simply engaged in the ordinary competitive practice of bidding against a competitor in the hope of obtaining the latter's customer for itself. Conoco's interest in advancing or maintaining its position in the Viburnum Trend was in keeping with the public policy favoring competition. Vigorous competition is to be encouraged as long as the means employed are not unfair or improper. *See National Rejectors, Inc. v. Trieman,* 409 S.W.2d 1, 39 (Mo.1966).

We have found no crystallized definition of wrongful means in the context of interference with prospective business relations. Restatement section 767 lists seven factors to be considered in making such a determination. These include the nature of the conduct, the actor's motive, the respective interests of the parties and of society, the proximity of the conduct to the interference, and the relations between the parties. Comment c to section 767 provides several examples of conduct considered wrongful, including physical violence, misrepresentations, threats or prosecution of civil or criminal suits, and unlawful conduct such as antitrust violations. We think that "wrongful means" in this context refers to means which are intrinsically wrongful—that is, conduct which is itself capable of forming the basis for liability of the actor. We need not formulate an exhaustive list of such conduct. We simply hold that Conoco's act of bidding against Inman Oil to obtain a customer for itself did not constitute a wrongful means of competition.[9]

**9.** *Shell Oil Co. v. State Tire & Oil Co.,* 126 F.2d 971 (6th Cir.1942), cited by Inman Oil, is inapposite. As the magistrate recognized, that case involved fraudulent misrepresentations by the defendant, conduct clearly qualifying as "wrongful means."

*The Breach of Contract Claim*

■ Inman Oil alleges that Conoco breached its implied obligation of good faith and fair dealing by bidding against it in 1980 and 1981 for the 1981 and 1982 contracts with St. Joe. We agree and reverse the magistrate on this issue.

"Any question about whether the duty of good faith and fair dealing reflects the law of Missouri was removed by the Missouri Legislature's adoption of R.S.Mo. section 400.1–203 in 1963. That section of the Uniform Commercial Code provides that 'every contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement.'" *ABA Distributors, Inc. v. Adolph Coors Co.*, 542 F.Supp. 1272, 1285 (W.D.Mo.1982).[10] This implied covenant imposes upon each party the duty to do nothing destructive of the other party's right to enjoy the fruits of the contract and to do everything that the contract presupposes they will do to accomplish its purpose. *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 728 (7th Cir.1979). Together with the express provision, found in each of the serial JFA's between the parties, that Conoco would promote the success of Inman Oil, the implied obligation of good faith and fair dealing represented Conoco's promise not to engage in activities hurtful to Inman Oil. *See J.C. Millett Co. v. Distiller's Distributing Corp.*, 258 F.2d 139, 144 (9th Cir.1958).

The magistrate found that no explicit provision in the contracts prohibited Conoco from competing with Inman Oil. Conoco had never failed to supply Inman Oil with the agreed-upon petroleum products. The changes in Conoco's delivery and freight allowance policies had been properly undertaken pursuant to the notice provisions of the JFA's. Conoco had exercised reasonable business judgment in restricting and relaxing Inman Oil's credit terms. On the basis of these findings, the magistrate concluded the evidence did not support the argument that Conoco breached its implied good faith obligation. We think the magistrate overlooked several facts demonstrating that Conoco failed to live up to the spirit of its agreements with Inman Oil.

A significant amount of testimony at trial indicated that no other oil supplier in the area bid directly against its own distributor, particularly where the customer involved was the distributor's pre-existing customer. In its brief on appeal Conoco does not dispute this, and no finding to the contrary was made by the magistrate. While several oil suppliers did make direct bids and then hired local jobbers to serve as delivery agents, it appears to have been a custom of the industry not to bid against one's own contractual jobber for the business of the jobber's pre-existing customer.

Over the years, Conoco's Branded Division had taken steps to comply with the obligation to promote the success of Inman Oil. The jobber had been provided with marketing advice and counselling, training seminars, lubricant engineering services, and bid assistance on most occasions when requested. Yet the bottom line of success is sales. In the face of these efforts by the Branded Division, Conoco's WCO took the one step designed to thwart Inman Oil's success—it used its superior position as a supplier to out-price Inman Oil and appropriate the latter's oldest and largest customer, St. Joe.

Conoco had earlier obtained St. Joe as an indirect Branded Division customer through the efforts and good will of Inman Oil. On the basis of its long-standing relationship with and confidence in Inman Oil, St. Joe had agreed to transfer much of its business from Sinclair to Conoco. However, Conoco evidently felt no obligation to repay this substantial favor by continuing to channel its St. Joe business through Inman Oil. Moreover, having acquired St. Joe as a direct customer, Conoco then refused to permit Inman Oil to serve as the delivery agent, giving that business instead to its consignee, Consolidated.

---

**10.** There is no dispute that the JFA's were contracts for the sale of goods and thus governed by the Uniform Commercial Code.

Under the totality of the circumstances in this case, we are convinced that Conoco breached its implied obligation of good faith and fair dealing. We therefore remand the case to the magistrate for a determination of Inman Oil's damages flowing from Conoco's 1980 and 1981 bids for the St. Joe contracts.

*Ronald C. Inman's Affirmative Defenses*

Conoco initially brought this lawsuit against Inman Oil Company and Ronald C. Inman, individually, to recover on a debt totalling $261,690.48. The magistrate found in favor of Conoco. In this appeal, Ronald C. Inman alleges that he asserted two affirmative defenses at trial which were neither considered nor ruled upon by the magistrate. Inman argues that this Court should either reverse the judgment against him or remand the cause and direct the magistrate to rule on his defenses.

■ The Emergency Petroleum Allocation Act of 1973, 15 U.S.C. sections 751 *et seq.* (as amended), took effect on May 15, 1973. Among other things, this Act prohibited changes in existing credit relationships between oil suppliers and distributors. Inman alleges that Conoco violated the Act by requiring him to sign a personal guaranty for the obligations of Inman Oil Company before extending credit to the company. This guaranty, however, was signed in 1972 in connection with the execution of the first Jobber Franchise Agreement. Thus, assuming without deciding that a personal guaranty is a credit term within the meaning of the Act, there was no prohibited tightening of credit terms because the guaranty was in existence on May 15, 1973.

■ Inman also alleges he received no consideration for his personal guaranty. This contention is without merit. The consideration for the guaranty was Conoco's extension of a line of credit to Inman Oil Company. Hence, we affirm the judgment against Ronald C. Inman.

## CONCLUSION

In sum, we affirm the magistrate with respect to Inman Oil's claims of a Robin-son-Patman Act violation, an attempted monopolization, and a tortious interference with business relations. We find no merit in Ronald C. Inman's affirmative defenses to the judgment against him. On Inman Oil's breach of contract claim, however, we find that Conoco did breach its implied obligation of good faith and fair dealing. We therefore reverse as to that issue and remand to the magistrate for a determination of damages.