**RICHARD SHORT OIL CO., INC., Appellant,**

v.

**TEXACO, INC., Appellee.**

**No. 85–1665.**

United States Court of Appeals, Eighth Circuit.

Submitted March 10, 1986.

Decided Aug. 25, 1986.

Merl O. Barns, Little Rock, Ark., for appellant.

G. Kenneth Handley, White Plains, N.Y., for appellee.

Before McMILLIAN and BOWMAN, Circuit Judges, and HANSON,* Senior District Judge.

HANSON, Senior District Judge.

Short Oil appeals the decision of the district court, asserting that it erred in granting Texaco's motion for summary judgment as to Short's claim that Texaco unreasonably withheld its consent for Short to assign its distributor's contract, and the district court's granting of Texaco's motion for a directed verdict for the two remaining counts of breach of contract and violation of the Robinson-Patman Act.

## I. BACKGROUND.

Between May of 1980 and December of 1982 Short Oil was a distributor of petroleum products sold by Texaco. As a wholesale distributor, Short was part of a dual distribution system in which both Short and Texaco supplied retail outlets. At the time that Short entered into the agreement the price of Texaco gasoline to its wholesale distributors was 3¼ cents below that which it had charged its direct supply retail outlets.

Under the marketing agreements between Short and Texaco, Short would receive a one percent discount for payment within ten days of delivery. Short was also entitled to purchase gasoline from other suppliers, and Texaco was free to sell to other distributors. Short also agreed: (1) not to commingle non-Texaco gasoline with Texaco gasoline; (2) not to sell any Texaco product to any customer it knew or had reason to believe would market it under a non-Texaco brand name; and (3) not to assign its marketing agreement without Texaco's prior written consent.

In September of 1980, Texaco began a nationwide rebate program whereby a buyer, whose monthly purchases exceeded a certain percentage of its purchases during a base period, received a price reduction on subsequent purchases of gasoline. At the start of this rebate program, Texaco of-

* The HONORABLE WILLIAM C. HANSON, Senior United States District Judge for the Northern and Southern Districts of Iowa, sitting by designation.

fered rebates to both distributors and retail service stations; however, in April 1981 Texaco put a ceiling on distributor rebates so that increased purchases up to 150 percent or 200 percent of base period volume would qualify for the rebate, but purchases above these levels would not. Short's initial marketing agreement expired after the announcement of these ceilings, and in May of 1981 Texaco and Short entered into a second marketing agreement.

The ceiling on the rebates continued through March 1982, even though during various months between April 1981 and March 1982 Texaco lifted the ceiling and granted increased rebates to distributors. In April 1982 Texaco granted distributors a uniform three cents per gallon reduction on all purchases and limited participation in the rebate program to direct purchasing retailers.

Although Short's agreement with Texaco prohibited sales to non-Texaco dealers, Short sold a substantial amount of gasoline to non-Texaco dealers throughout its two-year distributorship. It is also apparent from this record that, during the months in which Short bought in excess of the distributor ceiling, it sold a greater volume to non-Texaco dealers than it purchased beyond the ceiling level.

From the time Short began operation as a distributor in Little Rock, it encountered serious cash flow problems. Checks amounting to $80,000 submitted by Short to Texaco were returned for insufficient funds in the fall of 1980 and checks amounting to $111,000 were returned in October 1981. Short had entered into substantial debt in 1980 and 1981 at the same time it embarked upon an ambitious program of expansion. Despite Short's financial difficulties, its officers withdrew salaries of $98,000 in 1981 and $124,000 in 1982. Short stopped paying for the gasoline it purchased from Texaco in 1982 and still owes Texaco $194,000. Late in that year Short initiated Chapter 11 proceedings and was later declared to be bankrupt.

Prior to trial the district court granted Texaco's motion for summary judgment with regard to Short's claim that Texaco had refused to consent to the assignment of Short's lease. The district court found that Texaco had not been aware of any contractual negotiations between Short and the proposed buyer, and "no discussion at any time about an assignment of Short Oil's marketing agreement" had taken place between Texaco and Short.

In granting Texaco's motion for a directed verdict, the court ruled from the bench that plaintiff had failed to establish a prima facie case of a violation of the Robinson-Patman Act. The court stated that Short had failed to produce substantial evidence that Texaco committed anti-competitive practices directed at Short. The court also stated that Short had failed to establish that there was a nexus between the alleged anti-competitive practices of Texaco and the purported injuries. The court found that the evidence tendered by Short to establish anti-competitive practices was too speculative to submit the case to the jury, and that the jury would be required to indulge in conjecture to a substantial degree. Specifically, the court noted that plaintiff's exhibits 4 and 13, which purported to give a detailed computation of the alleged discriminatory practices, were deficient in a variety of particulars. In addition, the court found that Short had failed to establish a nexus between the anti-competitive conduct and the injury, pointing out that evidence persuasively showed that Short's problems were due to its own unfortunate business decisions and also to its undercapitalization.

With regard to the good faith and fair dealing count, the court also directed a verdict against Short, finding evidence deficient in either showing dishonesty or bad motive on the part of Texaco to injure Short by the implementation of its rebate program and its subsequent ceiling to the rebate program. The court found that there was no evidence of any conscious indifference or willfulness or wantonness on the part of Texaco in applying the rebate program so as to affect the contractu-

al relationship between Short and its consumers or customers.

## II. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE.

■ Short asserts the district court erred in granting a summary judgment motion against it on its claim for intentional interference with prospective economic advantage. The elements of the tort, under Arkansas law, are the existence of a valid business expectancy; knowledge of the business expectancy on the part of the alleged tortfeasor; intentional interference by the alleged tortfeasor causing a termination of the expectancy; and resultant damage to the party whose expectancy has been disrupted. *Kinco, Inc. v. Schneck Steel, Inc.*, 283 Ark. 72, 671 S.W.2d 178, 180 (1984).

It is undisputed that Short could not have assigned its distributorship without first obtaining Texaco's written consent. The basis for Short's claim that Texaco had unreasonably withheld consent is a telephone conversation between the prospective buyer, Keith Pilkington, and a Texaco employee in Little Rock after Pilkington had allegedly agreed on contract terms to purchase Short's distributorship. The record reveals that Pilkington did not tell the Texaco employee of his prospective contract with Short. Rather, he informed the Texaco employee of his interest in Short's station. Short argues that Texaco was on notice of a business expectancy by way of the telephone conversation between Pilkington and the Texaco employee.

■ We do not believe that Texaco was on notice of Short's intention to assign its marketing agreement so as to support Short's claim of intentional interference with its prospective economic advantage. No employee of Short Oil ever made any request to Texaco, either in writing or orally, with regard to the alleged assignment to Pilkington. Nor is there any reason why a Texaco employee should consider Pilkington's inquiry concerning Short's business as notification of Short's intention to assign its marketing agreement. Short having failed to notify of its intent to assign its marketing agreement, it cannot now claim that Texaco unreasonably withheld consent to the assignment. The district court therefore properly concluded that there was no issue of material fact and correctly granted the summary judgment motion.

## III. THE ROBINSON–PATMAN CLAIM.

Short asserts that the district court erred in directing a verdict against it on the Robinson-Patman claim that it was illegal for Texaco to charge any retail outlet a price lower than Short's, a wholesaler. The appropriate legal standard in directing a verdict at the end of the plaintiff's case in an antitrust action was set out by this court in *Admiral Theatre Corp. v. Douglas Theatre Company*, 585 F.2d 877 (8th Cir.1978):

> [T]he trial court must view the evidence in the light most favorable to the non-moving party and he must be given the benefit of all legitimate inferences without assessing credibility. However, "[a] jury is permitted to draw only inferences of which the evidence is reasonably susceptible, and may not be permitted to resort to speculation." (Citations omitted.) When the evidence is so one-sided as to leave no room for any reasonable difference of opinion as to how the case should be decided, it should be decided by the court as a matter of law rather than submitted to a jury for its determination. (Citations omitted.)

*Id.* at 883.

■ When a seller charges different prices to different customers, based on the different level of distribution occupied by those customers, there will normally be no Robinson-Patman problems if a seller charges a higher price to its customers further down the distribution chain—that is, if the seller charges more to retailers than to wholesalers. *See FLM Collision Parts, Inc. v. Ford Motor Co.*, 543 F.2d 1019, 1024–25 (2d Cir.1976). *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545

(1977). Short argues that in this case the customers further down the distribution chain were receiving lower prices, a practice amounting to a Robinson-Patman violation. To make out a Robinson-Patman claim, Short must show that Texaco was engaged in conduct which is forbidden in the antitrust laws, must show that it was injured in its business or property, and must show a causal relationship between these first two elements. 15 U.S.C. § 15 (1982).

A. *Discrimination in Price.*

■ Section 2(a) of the Robinson-Patman Act makes it "unlawful for a seller to discriminate in price." The Supreme Court in *F.T.C. v. Anheuser-Busch, Inc.*, 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960), held that "discrimination" is nothing more than a "difference" in price. *Id.* at 549, 80 S.Ct. at 1274. The discrimination requirement is a jurisdictional, and not substantive, element of a § 2(a) violation. Given the fact that plaintiff's exhibits 4 and 13 demonstrate differences in price, Short has met its threshold jurisdictional burden of establishing a difference in price.

■ Texaco argues that discrimination in price must be established, not by looking at isolated specific instances of price discrimination, but rather at the difference in prices "over time." *See Falls City Industries, Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 435, 103 S.Ct. 1282, 1289, 75 L.Ed.2d 174 (1983). However, inquiry regarding the existence of discrimination does not involve an inquiry beyond the simple fact that a difference in price exists. *F.T.C. v. Anheuser-Busch, Inc.*, 363 U.S. at 549, 80 S.Ct. at 1274. These inquiries are relevant, but they arise at a later stage in the analysis and do not affect whether there has been a discrimination. *See* E. Kintner & J. Bauer, *Federal Antitrust Law III* § 21.6, at 164.

B. *Injury to Competition.*

■ Price discrimination will rise to the level of a § 2(a) violation only if it is such an injury as will with reasonable prob-

ability substantially lessen the ability of unfavored buyers to continue to compete. *See American Oil Company v. F.T.C.*, 325 F.2d 101, 104 (7th Cir.1963), *cert. denied,* 377 U.S. 954, 84 S.Ct. 1631, 12 L.Ed.2d 498 (1964). In order to set out a prima facie case of a § 2(a) injury, Short had the burden to prove that the price discrimination produced a reasonable possibility of financial injury to competition. The Act refers not to the effect upon competitors, but to the effect upon competition in general. That is, analysis of the injury to competition focuses on whether there has been a substantial impairment to the vigor or health of the contest for business, regardless of which competitor wins or loses. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

■ The record in this case indicates that there was little, if any, injury to competition in the Little Rock area by virtue of the discrimination in prices. On the contrary, the evidence at trial indicated that Texaco was only one of many sellers in the market and that the market was highly competitive and remained so after the changes in its rebate program.

Nor has Short shown any substantial injury to its competitive position. Injury to competition is established by proof "of a substantial price discrimination between competing purchasers over time." *Falls City Industries v. Vanco Beverage, Inc.*, 460 U.S. at 435, 103 S.Ct. at 1289. Short's exhibits 4 and 13, which form the basis of its proof of competitive injury, were constructed so that the volume of the discriminatory sales and the duration of any price differences could not be ascertained. Moreover, the fact that Short's exhibits rely solely on end of the month sales rather than examining sales throughout the entire month, would have forced the jury to speculate as to whether there had been substantial injury over time.

In the final analysis, to sustain its prima facie case of injury to competition, Short would have had to present evidence of the

amount and percentage of the discrimination and the degree of competition it faced in the market, as well as sustained price differentials which are more than de minimus. *See* E. Kintner & J. Bauer, *Federal Antitrust Law III* § 22.6, at 270–71 (1983). The evidence presented by Short in this case as to the nature of the competitive market, the duration of the discriminatory sales, and the volume of the difference in price would have made it impossible for the jury to draw any reasonable conclusions. We conclude, therefore, that the district court properly found Short's injury to competition evidence insufficient to establish a prima facie case.

### C. *Causation.*

Assuming that Short had been able to establish competitive injury, it would have also had to have shown that the adverse effect was caused by the discriminatory price practice. *See J. Truett, Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981). In order to establish the causal relationship between the discrimination in price and the injury to competition in a secondary-line case such as this, one customer must be paying more for its goods than is its competitor. In most cases it is reasonable to infer that the disfavored competitor is injured as the result of the discrimination. *See F.T.C. v. Morton Salt Company*, 334 U.S. 37, 50, 68 S.Ct. 822, 830, 92 L.Ed. 1196 (1948). There will not be liability, however, even if there has been a difference in price, when the injury is the result of the plaintiff's own competitive shortcomings, rather than a merely coincidental discrimination in price. *American Can Company v. Russellville Canning Company*, 191 F.2d 38, 60 (8th Cir.1951).

No evidence was presented at trial that Short actually lost sales to any competing Texaco station as the result of the difference in prices; nor was there any evidence that Short ever lowered its prices and decreased its profits in order to compete with any lower price by a Texaco dealer. As a result, the district court found that Short had failed to establish the nexus between Texaco's alleged anticompetitive practices and the alleged injuries sustained by Short.

In addition, there was ample evidence presented at trial Short's mismanagement and questionable business practices as being the cause of its alleged injury. Evidence was presented of Short's undercapitalization, debts in the neighborhood of $900,000, over-rapid expansion program, problems of cash flow and return of checks for insufficient funds, and payment of excessive salaries to its officers. As we stated in *American Can Company*, "[w]e think there were too many factors bearing upon the decline of plaintiff's earning power to justify blaming it upon the trade practices of the defendant." *Id.* at 60. Consequently, we conclude that Short failed to present a prima facie case of the causal relationship between differences in prices and its alleged injury.

The district court therefore properly directed a verdict against Short on its Robinson-Patman claim.

### IV. THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM.

Short asserts that the district court erred in directing a verdict against it on its implied covenant of good faith and fair dealing claim in which it argued that Texaco had discriminatorily applied its rebate program between Short and retail outlets. Short asserts that the rebate program amounted to a "bait and switch" program in which Texaco initially offered a rebate program which it then altered, thus resulting in Short's injury. Specifically, Short maintains that during the second year of the rebate program, when Texaco introduced the 150 per cent to 200 per cent ceiling on distributor rates, the result was to place Short at a severe competitive disadvantage as against Texaco's direct delivery outlets. Short insists that it was entitled to have the jury decide whether Texaco could alter the contract without violating

the good faith duty to "do everything that the contract presupposes."

With regard to the standard for a directed verdict for a claim of violation of the covenant of good faith and fair dealing, questions about what amounts to good faith or bad faith are questions of law for the court to decide. *See* C. Kaufman, *Corbin on Contracts* § 654B, at 797 (1984 Supp.). Upon this record, we would have to conclude that Short presented insufficient evidence that Texaco's imposition of the cap on the rebate program amounted to a breach of the covenant of good faith and fair dealing.

■ Short asserts the district court incorrectly assumed that, to make out a prima facie case that Texaco had breached its implied covenant of good faith and fair dealing, the plaintiff had to prove dishonesty or bad motive. Short's assertion, however, would amount to allowing it to go forward with a claim for a violation of the covenant of good faith and fair dealing premised upon the mere conclusory allegation of the violation. On the contrary, we believe Short must be able to show that the breach of good faith and fair dealing was made with a prohibited motive. If no real possibility of a prohibited state of mind is shown, the mere conclusory allegation of bad faith would be insufficient to defeat a directed verdict motion. *Id.* The district court therefore correctly ruled, in the first instance, as to the credibility of the bad motive evidence presented by Short.

■ Upon this record, it is apparent that Short did not produce sufficient bad motive evidence; nor did it produce adequate evidence of the recapture of foregone opportunities, as have other successful claimants in this kind of case. *See Conoco, Inc. v. Inman Oil Company, Inc.,* 774 F.2d 895, 908 (8th Cir.1985); *Photovest Corp. v. Fotomat Corp.,* 606 F.2d 704, 727–29 (7th Cir.1979); *see also* Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith,* 94 Harvard Law Review 369, 387 (1980). Rather, the evidence demonstrates that Texaco announced that it was introducing the cap on its rebate program before the parties entered into the second contract and before Short accepted that contract. In addition, the fact that this was a nationwide program would indicate that there is no evidence of conscious indifference, willfulness, or wantonness on the part of Texaco in applying the rebate program so as to affect the contractual relationship between Short and its customers or consumers. As we stated earlier, if anything, competitive conditions in the market and Short's own bad business decisions contributed to its demise. Therefore, the district court correctly concluded that there was no evidence presented of Texaco's bad faith in its altering the rebate program.

■ In addition, it is apparent that the Uniform Commercial Code provisions on establishing an open price term provide a basis to conclude that Texaco did not act in bad faith when it introduced the cap on its rebate program. Section 85–2–305(2) of the Arkansas Annotated Statutes states that the price fixed by the seller means a price fixed in good faith. Official Comment 3 to § 85–2–305 adds that in the normal case a "posted price" satisfies the good faith requirement. *Id.* Texaco's posted price, offered to all its distributors nationwide, therefore appears to satisfy § 85–2–305(2). Moreover, when Short was free to buy from others if Texaco would not match prices offered by these other sellers, while Texaco was bound to fill Short's requirements whenever it so demanded, demonstrates there could be no claim of bad faith based on § 85–2–305(2). *See Harvey v. Fearless Farris Wholesale, Inc.,* 589 F.2d 451, 461 (9th Cir.1979).

■ Furthermore, Texaco's conduct conforms with the U.C.C. definition of good faith as "honesty in fact" and, in transactions between merchants, as "the observance of reasonable commercial standards of fair dealing in the trade." Ark.Stat. Ann. §§ 85–1–201(19), 85–2–103(1)(b) (1961).

*See Conoco, Inc. v. Inman Oil Company, Inc.,* 774 F.2d at 908. Short did not produce evidence of the pricing or rebate practices of other oil companies in Little Rock or elsewhere; nor did Short present evidence of retailer-wholesaler price margins, price rebates, or ceilings on price rebates. In sum, Short failed to present evidence sufficient to set out a claim for violation of good faith performance under Arkansas statutory law.

■ Finally, even if Short had presented some evidence of a violation of the duty of good faith and fair dealing under either the common law or Arkansas statutory law, we believe it would have been improper to submit this case to the jury in light of the ample evidence presented of Short's own bad faith in its performance of the contract. The marketing agreement between Short and Texaco required that Short not sell Texaco products to non-Texaco dealers. During the months in which Short bought in excess of the distributor ceiling, it sold a greater volume to non-Texaco dealers than it purchased beyond the ceiling levels. In fact, the testimony demonstrates that if Short had not made the sales to unbranded stations it would never have reached the ceilings. Tr. at 150. As a result, because Short complains of the amounts it would have been entitled to beyond the ceilings, and because it is apparent that Short's sales to unbranded stations, in violation of the contract with Texaco, enabled it to pass the ceilings, there is no basis for it to make out a claim that Texaco violated the covenant of good faith and fair dealing.

We therefore conclude that the district court did not err in directing a verdict against Short on its good faith and fair dealing claim.

For all of the reasons stated above, we conclude that the findings of the district court were well within the evidence and therefore affirm its summary judgment and directed verdicts.